COLORADO COURT OF APPEALS                                    2017COA31

Court of Appeals No. 16CA0101
City and County of Broomfield District Court No. 14CV30139
Honorable C. Scott Crabtree, Judge

Broomfield Senior Living Owner, LLC, a Delaware limited liability company; and Sunrise Development, Inc., LLC, a Virginia corporation,

Plaintiffs-Appellants,

v.

R.G. Brinkmann Company, d/b/a Brinkmann Constructors, a Missouri corporation,

Defendant-Appellee.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division V
Opinion by JUDGE FREYRE
Ashby, J., concurs
Davidson*, J., specially concurs

Announced March 9, 2017

Fox Rothschild LLP, Patrick J. Casey, Spencer L. Sears, Risa B. Brown, Denver, Colorado, for Plaintiffs-Appellants

Markusson, Green, and Jarvis, Gregg S. Rich, Daniel R. Coombe, Wyatt M. Cox, Denver, Colorado, for Defendant-Appellee

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2016.

¶ 1     In this construction defect case involving a senior assisted and independent living facility (senior facility), we must decide whether the parties' contract or relevant Colorado statutes govern the accrual of defect claims.  To do so, we must decide a matter of first impression — whether a senior facility constitutes "residential property" that is protected by a provision of the Construction Defect Action Reform Act (CDARA) entitled the "Homeowner Protection Act of 2007" (HPA).[1]  The HPA renders a contract's limitation or waiver of CDARA's rights and remedies void as against public policy in cases involving claims arising from residential property.

¶ 2     Plaintiffs, Broomfield Senior Living Owner, LLC and Sunrise Development, Inc., LLC (collectively Broomfield), appeal the trial court's order granting summary judgment for defendant, R.G. Brinkmann Company d/b/a Brinkmann Constructors (Brinkmann).  Broomfield brought claims against Brinkmann for breach of contract, negligence, negligence *per se*, negligent

---

[1] The title "Homeowner Protection Act of 2007" does not appear anywhere in the current statutes; however, the text of the session law enacting the HPA included a short title that indicated "[t]his act shall be known and may be cited as the 'Homeowner Protection Act of 2007.'"  Ch. 164, sec. 1, 2007 Colo. Sess. Laws 610.

misrepresentation,[2] and breach of express warranties. Brinkmann raised both contractual limitations and statutory limitations defenses to all of Broomfield's claims. Because we conclude that the term "residential property" in the HPA unambiguously includes senior facilities, we find the contract's accrual provisions void as against public policy. Therefore, the relevant statutory accrual provisions apply here. We further conclude that genuine issues of material fact remain regarding (1) when the defects were discovered and any claims accrued; (2) whether Brinkmann engaged in impermissible design services outside of the contract; (3) whether Brinkmann was given an adequate opportunity to correct the defects; and (4) whether the defects alleged are latent or patent. Accordingly, we reverse and remand for further proceedings.

I.     Background

¶ 3     In 2007, Sunrise Development and a former owner entered into an American Institute of Architects Standard Form of Agreement contract (the contract) for the construction of a senior

---

[2] The trial court did not address this claim and neither did the parties in their briefs. Therefore, we do not consider it.

living community (the building) in Broomfield, Colorado.[3]  The

contract contains a general warranty provision, § 3.5, which

guarantees that the materials and equipment used will "be of good

quality" and that the work will be "free from defects not inherent in

the quality required or permitted, and that the work will conform to

the requirements of the Contract Documents."  In addition to the

general warranty provision, the contract includes an additional

warranty (§ 12.2.2) for latent defects discovered after the date of

final completion.  *See infra* Appendix 1.  In relevant part, this

additional warranty extends the warranty period by one year

following discovery of the latent defect.  It requires the owner to

promptly notify the contractor of any defect and provides that an

owner who fails to provide prompt notice of a defect waives the right

to require its correction or to make a claim for breach of warranty.

---

[3] Broomfield Senior Living is the current owner of the building and assumed ownership through a transfer of title from the original owner.  The parties agree that specific contract language (§ 13.2.1), giving successive owners rights and obligations under the contract, gives Broomfield standing to bring a breach of contract claim, despite its status as a subsequent owner.  Therefore, our breach of contract analysis is limited to subsequent owners who have contractual standing.

A contractor's failure to correct the defect in a reasonable period of time permits the owner to make the correction.

¶ 4    The contract also includes a clause (§ 13.7) limiting Brinkmann's liability in the event the work was defective. *See infra* Appendix 2. This clause contains three separate accrual provisions. It provides that claims arising from acts or failures to act (1) occurring before substantial completion accrue no later than the date of substantial completion; (2) occurring between substantial completion and final payment certificate accrue no later than the final payment certificate issuance date; and (3) occurring after final payment accrue no later than the time provided in the warranty (§ 3.5) or the additional warranty (§ 12.2), whichever is later.

¶ 5    A certificate of substantial completion was issued on March 16, 2009. The project was completed on May 15, 2009, when a certificate of occupancy was issued. At that time, neither Broomfield nor Brinkmann noted any defects in the construction of the building.

¶ 6    In the fall of 2012, Broomfield discovered sewer flies and hired a general contractor to investigate their cause. The contractor determined that the sewer flies resulted from broken sewer pipes.

Because the pipes were located beneath concrete slabs, they could not be readily accessed or repaired. Thus, on November 27, 2012, Broomfield began excavation beneath the building to inspect and repair the broken pipes. The contractor eventually advised Broomfield that the breaks resulted from soil expansion and recommended further investigation of other potential pipe breaks.

¶ 7     On April 26, 2013, Broomfield hired SBSA, Inc. (SBSA) to conduct this further investigation. SBSA began its investigation on May 3, 2013, and continued investigating through March 2015. During that two-year period, SBSA identified numerous building defects that it attributed to improper construction. *See infra* Appendix 3.

¶ 8     On November 21, 2013, SBSA issued a notice of latent defects to Broomfield identifying the defects discovered. On January 28, 2014, Broomfield issued a notice of claim informing Brinkmann of the latent defects. On March 13, 2014, Brinkmann conducted a site visit. In a letter dated May 12, 2014, Brinkmann rejected the notice of claim, stating that the "primary problem affecting this site is the soils." It noted that the building itself had not moved and credited the proper design and construction of the void space to this

non-movement. After comparing the list of defects provided by Broomfield to the construction documents, Brinkmann concluded that it had performed its work in accordance with the documents, that there was no defective construction, and that there was no "work requiring repair."

¶ 9 On July 21, 2014, Broomfield filed its complaint against Brinkmann. Brinkmann responded with a motion for summary judgment arguing that there were no issues of material fact because the statute of limitations — as established by the terms of the contract — had run. The trial court granted Brinkmann's motion for summary judgment, reasoning that because all claims accrued under the contract at final completion (May 15, 2009), the two-year statute of limitations applicable to civil claims under § 13-80-102(1)(a), C.R.S. 2016, expired on May 15, 2011, three years before Broomfield filed its complaint. As to latent defects, the court concluded that Broomfield had waived its right to assert claims for repairs under the contract by failing to give Brinkmann prompt notice of the defects or an adequate time to repair them before performing the repair work itself.

## II.    Analysis

¶ 10    Broomfield contends the trial court erred in granting summary judgment and applying the accrual provisions of the contract rather than CDARA's accrual provision in § 13-80-104(1)(b)(I), C.R.S. 2016.  It reasons that the contractual limitations contained in section 13.7.1.1 of the contract are void as against public policy under the plain language of the HPA.  Brinkmann responds that the contract modification was permissible and that all claims accrued on March 16, 2009, at substantial completion or at the latest on May 15, 2009, at final completion.  While Brinkmann does not dispute that Broomfield is the property owner, it argues that the term "residential property" in the HPA is ambiguous and that the legislative history demonstrates that Broomfield is not the type of "residential property owner" the HPA was intended to protect because it is a commercial entity.

## A.    Standard of Review

¶ 11    We review a trial court's order granting summary judgment de novo.  *Lewis v. Taylor*, 2016 CO 48, ¶ 13; *W. Elk Ranch, L.L.C. v. United States*, 65 P.3d 479, 481 (Colo. 2002).  Summary judgment is a drastic remedy and is appropriate only when the pleadings and the supporting documentation show that no genuine issue of

7

material fact exists and that the moving party is entitled to judgment as a matter of law. *W. Elk Ranch, L.L.C.*, 65 P.3d at 481. In determining whether a genuine issue of material fact exists, we look at the "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." C.R.C.P. 56(c). Like the trial court, we may not assess witness credibility and the weight of evidence when determining a motion for summary judgment. *Anderson v. Vail Corp.*, 251 P.3d 1125, 1127 (Colo. App. 2010). "The nonmoving party is entitled to the benefit of all favorable inferences from the undisputed facts, and all doubts as to the existence of a triable issue of fact must be resolved against the moving party." *W. Elk Ranch, L.L.C.*, 65 P.3d at 481. A "material fact" is one that will affect the outcome of the case or claim. *Thompson v. Md. Cas. Co.*, 84 P.3d 496, 501 (Colo. 2004).

¶ 12     Additionally, both contractual interpretation and statutory interpretation present questions of law that we review de novo. *Lewis*, ¶ 14 (statutory interpretation reviewed de novo); *Union Ins. Co. v. Houtz*, 883 P.2d 1057, 1061 (Colo. 1994) (interpretation of contracts reviewed de novo); *Douglas v. City & Cty. of Denver*, 203

P.3d 615, 618 (Colo. App. 2008) (statutory interpretation reviewed de novo).

## B. Accrual Dates Comparison

¶ 13    Under sections 13.7.1 and 13.7.2 of the contract, all of Brinkmann's "acts or failures to act" accrued at the earliest at substantial completion (March 16, 2009) and at the latest at final completion (May 15, 2009). Thus, under § 13-80-102(1), the contractual limitations period expired on either March 16, 2011, or May 15, 2011, irrespective of when the acts or failures to act were discovered.

¶ 14    In contrast, CDARA links the accrual of construction defect claims to their discovery. Under § 13-80-104(1)(b)(I), Brinkmann's acts or failures to act accrued on the date that the "physical manifestations of a defect" were discovered or in the exercise of reasonable diligence should have been discovered. It is undisputed that the first physical manifestations of a defect in the building were the sewer flies that appeared sometime in the fall of 2012. Thus, under CDARA, the claims accrued in the fall of 2012, and under § 13-80-102(1), the statute of limitations expired in the fall of 2014. Additionally, § 13-80-104(1)(a) contains a statute of repose

9

which expires six years "after the substantial completion of the improvement to the real property," unless it is extended two years because the underlying cause of action arose "during the fifth or sixth year after substantial completion of the improvement to real property." *See also In Re Goodman v. Heritage Builders*, 2017CO 13 ¶¶ 8,11. Key to both the limitations period and the repose period is the claim accrual date.

### C. Homeowner Protection Act

¶ 15    The HPA represents that portion of CDARA that is intended to preserve adequate rights and remedies for residential property owners who bring construction defect actions. § 13-20-802, C.R.S. 2016. It provides in relevant part:

> In order to preserve Colorado residential property owners' legal rights and remedies, in any civil action or arbitration proceeding described in section 13-20-802.5(1), any express waiver of, or limitation on, the legal rights, remedies, or damages provided by the "Construction Defect Action Reform Act" . . . or on the ability to enforce such legal rights, remedies, or damages within the time provided by applicable statutes of limitation or repose are void as against public policy.

§ 13-20-806(7)(a), C.R.S. 2016.

¶ 16    Thus, if Broomfield is a "residential property owner," then section 13.7 of the contract — which shortens the period in which claims accrue by eliminating the time for discovery of the defect provided in § 13-80-104(1)(b)(I) — constitutes a limitation on the ability to enforce rights, remedies, and damages under CDARA and is void as against public policy under the HPA.

¶ 17    To determine whether Broomfield is a "residential property owner" we employ the tenets of statutory construction.  In interpreting a statute, our primary objective is to ascertain and give effect to the intent of the legislature.  *Specialty Rests. Corp. v. Nelson*, 231 P.3d 393, 397 (Colo. 2010).  We look first to the statutory language, giving words and phrases their plain and ordinary meanings.  *Doubleday v. People*, 2016 CO 3, ¶ 19.  We read words and phrases in context and construe them according to the rules of grammar and common usage.  *Id.*; *Gagne v. Gagne,* 2014 COA 127, ¶ 25.  In doing so, we read the statutory scheme as a whole, and we give consistent, harmonious, and sensible effect to all of its parts.  *Doubleday*, ¶ 19.  "If the statutory language is clear, we interpret the statute according to its plain and ordinary meaning," *Nelson*, 231 P.3d at 397, and we need not conduct any

further statutory analysis.  *Gagne*, ¶ 27.  If, however, the words are ambiguous or unclear such that they "do not inexorably lead to a single result," we may employ other interpretive aids, including consideration of the legislative history or the title of the statute, to determine the object sought to be attained by the statute and the consequences of a particular construction.  *State v. Nieto*, 993 P.2d 493, 501 (Colo. 2000); *see also Concerned Parents of Pueblo, Inc. v. Gilmore*, 47 P.3d 311, 313 (Colo. 2002) (stating that if the language is ambiguous we can look to the title of the statute to determine the General Assembly's intent).

¶ 18    We begin with the plain language of § 13-20-806(7)(a) and note that it applies only to "claimants asserting claims arising out of residential property."  § 13-20-806(7)(c).  Because the statute does not define "residential property,"[4] we consider its common usage.  *Griego v. People*, 19 P.3d 1, 9 (Colo. 2001) ("We consult definitions contained in recognized dictionaries to determine the ordinary meaning of words.").

---

[4] Neither party contests that Broomfield owns the property in question, so the focus of our inquiry is whether the building is a "residential property" for purposes of the HPA.

¶ 19    "Residential" plainly means using or designed for use as a residence.  *See* Webster's Third New International Dictionary 1931 (2002) (defining residential as "used, serving, or designed as a residence or for occupation by residents").  "Residence," in turn, plainly means a structure where people live.  *See* Black's Law Dictionary 1502 (10th ed. 2014) (defining residence as "[t]he place where one actually lives," a "dwelling," and a "house or other fixed abode"); *see also* The American Heritage Dictionary of the English Language 1483 (4th ed. 2000) (defining residential as "[o]f, relating to, or having residence," or "[o]f, suitable for, or limited to residences," and defining residence as "[t]he place in which one lives; a dwelling," or "[t]he act or a period of residing in a place").

¶ 20    Additionally, although CDARA does not define "residential property," it defines "commercial property" as "property that is zoned to permit commercial, industrial, or office types of use." § 13-20-802.5(4), C.R.S. 2016.  We glean from this definition that the legislature considers a property's zoning relevant to its intended purpose.  *Anderson v. Longmont Toyota, Inc.*, 102 P.3d 323, 327 (Colo. 2004) ("[W]e read the statute as a whole and, if possible, construe its terms harmoniously . . . .").  Here, it is undisputed that

13

the building project was part of the fourth amendment to the MidCities Planned Unit Development (P.U.D.) Plan and Preliminary Plat and that the building was specifically designed for multi-family residential use, including senior assisted and independent living residences. Moreover, the seventh amendment to the MidCities P.U.D. confirmed that the property was zoned for residential uses only, including senior housing.

¶ 21 Further, in the context of property tax law, the legislature and the Colorado Constitution define "residential real property" as all residential dwelling units and the land they are situated upon, excluding hotels and motels. § 39-1-102(14.5), C.R.S. 2016; *see also* Colo. Const. art. X, § 3(1)(b). Indeed, this court has consistently interpreted "residential" to mean for the purposes of living or dwelling. *Houston v. Wilson Mesa Ranch Homeowners Ass'n*, 2015 COA 113, ¶ 16; *see also Jensen v. City & Cty. of Denver*, 806 P.2d 381, 385 (Colo. 1991) ("Apartments and boarding/rooming houses used on a long term basis . . . properly are included within the definition of residential property."); *Double D Manor, Inc. v. Evergreen Meadows Homeowners' Ass'n*, 773 P.2d

14

1046, 1051 (Colo. 1989) (facility caring for disabled children is considered residential property).

¶ 22    We conclude, therefore, from the consistent dictionary definitions, the building's zoning, other statutory definitions, and decisions from this court, that the term "residential" is unambiguous and means an improvement on a parcel that is used as a dwelling or for living purposes.  In reaching this conclusion, we necessarily reject Brinkmann's argument that the legislature's failure to define "residential property" renders that term ambiguous. *See Wisdom Works Counseling Servs., P.C. v. Colo. Dep't of Corr.*, 2015 COA 118, ¶ 38 ("But legislative failure to define a statutory term does not necessarily make the statute ambiguous.  This is especially true where . . . the undefined term has a commonly understood meaning.") (citation omitted); *Dillabaugh v. Ellerton*, 259 P.3d 550, 552 (Colo. App. 2011) (stating that absence of statutory definition does not create ambiguity if court can discern term's ordinary and common meaning).

¶ 23    Moreover, we are not persuaded by Brinkmann's argument that *Phillips v. Monarch Recreation Corp.*, 668 P.2d 982 (Colo. App. 1983), or public policy requires a different result.  To the contrary,

15

*Phillips* reinforces our conclusion that "[s]tatutory provisions may not be modified by private agreement if doing so would violate the public policy expressed in the statute." *Id.* at 987.

¶ 24     Here, the building is used to house senior residents. Neither Brinkmann nor the plaintiffs contest that the senior residents live in the building or use it for any purpose other than ordinary living. Instead, all parties agree that the building is used as a home for senior residents. Moreover, the term "residential" in § 13-20-806(7) is used to describe the property owned, not to limit its applicability to any specific type of owner, whether an entity or a natural person.

¶ 25     Finally, we are not persuaded that Broomfield's receipt of rental income from the senior residents makes the building "commercial property" because the "receipt of income does not transform residential use of property into commercial use." *Houston*, ¶ 24. Accordingly, we conclude that the senior facility is "residential property," that Broomfield is a "residential property owner," and that the HPA applies.[5]

---

[5] While we use "Broomfield" throughout this opinion to refer collectively to both Sunrise Development, and Broomfield, here we refer only to Broomfield in concluding that the HPA applies to it as a residential property owner. Sunrise Development conceded in the

### III.    Application

¶ 26    Because the HPA applies, the limitation on the accrual of claims contained in section 13.7 of the contract is void as a matter of public policy, and the relevant statutory accrual of claims periods apply.  A claim in a civil action accrues "on the date *both the injury and its cause* are known or should have been known by the exercise of reasonable diligence."  § 13-80-108(1), C.R.S. 2016 (emphasis added); *see also Morrison v. Goff*, 91 P.3d 1050, 1053 (Colo. 2004) (applying § 13-80-108(1) to negligence claims).  In contrast, under CDARA, claims for construction defects generally accrue on the date "the claimant or the claimant's predecessor in interest discovers or in the exercise of reasonable diligence should have discovered the *physical manifestations of a defect* in the improvement which ultimately causes the injury."  § 13-80-104(1)(b)(I) (emphasis added).  Accrual under CDARA, therefore, depends on the discovery of the *manifestation* of the defect and not its cause.  *See United Fire Grp. ex rel. Metamorphosis Salon v. Powers Elec., Inc.*, 240 P.3d 569, 573 (Colo. App. 2010) (holding that the building fire itself, not the

---

trial court that it was not a residential property owner and that the HPA did not apply to it.  We do not find otherwise.

discovery of the cause of the building fire — defective construction — began the running of the statute of limitations).  Once a CDARA claim accrues, any action must be brought within two years under § 13-80-102(1).  *See* § 13-80-104(1)(a).

¶ 27    However, CDARA does not govern *all* claims brought against construction professionals.  Indeed, the accrual language of § 13-80-104(1)(b) "was never intended to limit claims for breach of warranties to repair and replace."  *Hersh Cos. v. Highline Vill. Assocs.*, 30 P.3d 221, 225 (Colo. 2001).  Instead, breach of warranty claims accrue when the breach is discovered or in the exercise of reasonable diligence should have been discovered under § 13-80-108(6).  Once a breach of warranty claim accrues, any action must be brought within three years under § 13-80-101, C.R.S. 2016. *Hersh Cos.*, 30 P.3d at 225

¶ 28    Moreover, the scope of CDARA is limited to actions seeking the recovery of damages for "'[a]ny deficiency in the design, planning, supervision, inspection, construction, or observation of construction of any improvement to real property,' or injury to property or person caused by such deficiency."  *Id.* (quoting § 13-80-104(1)(c)(I)-(III)).  Thus, whether Broomfield's breach of contract

claim falls within CDARA and accrues upon the discovery of the *physical manifestation* of a defect under § 13-80-104(1)(b)(I) or outside of CDARA and accrues upon the discovery of the defect itself under § 13-80-108(6) depends on the nature of the allegations in the complaint. *See Hersh Cos.*, 30 P.3d at 224-25; *see also* § 13-80-108(6) ("A cause of action for breach of any express or implied contract, agreement, warranty, or trust shall be considered to accrue on the date the breach is discovered or should have been discovered by the exercise of reasonable diligence.").

## A.    Breach of Contract

¶ 29    Broomfield's amended complaint alleged that Brinkmann failed "to perform the services for the Residential Project that were the subject of the agreements." Assuming, without deciding, that the more restrictive accrual period of CDARA applies, we conclude that Broomfield's breach of contract claim accrued upon the "physical manifestation of a defect." The parties agree that the first *manifestation* of a defect was the sewer flies that appeared in the fall of 2012. Because Broomfield filed this action in July 2014 (summer of 2014), we conclude it was timely under § 13-80-104(1)(a) and

section 13-80-102(1) and reverse the judgment entered on this claim.

## B. Breach of Warranty

¶ 30    Section 12.2.2 of the contract sets forth Brinkmann's obligations in addition to the general warranty and covers both patent defects and latent defects[6] that were not active or apparent by reasonable inspection before the end of the warranty period.[7]  As relevant here, the contract requires the owner to provide the contractor with written notice of any non-compliant work "promptly after discovery of the non-compliant condition."  The contract then expands any applicable period by one year from the date the defect is discovered to correct the non-compliant condition.  Finally, during this extended applicable period, the owner must give the contractor the opportunity to make the correction, and the owner's failure to do so waives its rights to require correction of the work and to make a claim for breach of warranty.

---

[6] Because Broomfield alleged that all defects were latent in its complaint, we address only that portion of the contract.
[7] Though not at issue we note that § 13-80-104(1)(a), C.R.S. 2016, would preclude any claims for latent defects discovered more than six years after substantial completion of the property improvement.

20

¶ 31    Broomfield contends the trial court erred in precluding its breach of warranty claim based on its failure to give Brinkmann an opportunity to correct the alleged defects.  It argues that the record and all reasonable inferences from the record do not support the court's finding that all repair work was completed before Brinkmann had an opportunity to correct the alleged defects and that genuine issues of material fact concerning notice and repair work remain.  Brinkmann responds that it was not obligated to repair and correct latent defects unless Broomfield provided adequate notice of them.  It reasons that because Broomfield did not provide adequate notice of the defects before making its own repairs, the trial court properly granted summary judgment.  We conclude that genuine issues of material fact remain concerning whether Brinkmann was promptly notified of the latent defects and was given an opportunity to correct any defective work and, thus, that summary judgment was improper.

¶ 32    "The question of the existence of a warranty and whether that warranty was breached is ordinarily one for the trier of fact."  *Stroh v. Am. Recreation & Mobile Home Corp. of Colo.*, 35 Colo. App. 196, 201, 530 P.2d 989, 993 (1975).  As previously discussed, claims for

breach of warranty accrue upon the discovery of the defect under § 13-80-108(6). However, once accrued, these claims expire after three years, under the statute of limitations period set forth in section 13-80-101. *Hersh Cos.*, 30 P.3d at 225-26.

¶ 33    In this case, the parties presented conflicting evidence about whether the warranty was breached. Relying on the facts contained in the sworn affidavit of Edward L. Fronapfel (Fronapfel affidavit), the owner of SBSA, Broomfield argues that the latent defects were not discovered until SBSA began excavating the site on May 3, 2013, and issued its notice of latent defects to Broomfield on November 21, 2013. It asserts that its January 2014 notice to Brinkmann to correct the defects was timely under the contract and provided sufficient opportunity for Brinkmann to correct them.

¶ 34    On the other hand, Brinkmann argues that the warranty could not have been breached because it was not given a reasonable opportunity to correct the defects. In support, Brinkmann relies on deposition testimony and on invoices issued to Broomfield by the architecture and engineering firm Gobbell Hays Partners, Inc. (GHP), indicating that some repair work occurred.

¶ 35     Our independent review of these invoices confirms that GHP performed some repair work; however, they do not specify the type of repair work done, or indicate whether such repairs related to the latent defects alleged. Indeed, we note that Brinkmann's May 12, 2014, letter, attributing the latent defects to soils expansion and declining to conduct repairs, does not state that any repairs had been completed before its March 2014 site visit. Because the date on which each defect was discovered is disputed, and because whether and on what dates any repairs were completed is disputed, we conclude, viewing the facts and reasonable inferences in the light most favorable to Broomfield, that factual disputes remain concerning whether Brinkmann received prompt notice of the defects under the contract and whether it had an opportunity to correct its work. Accordingly, we reverse summary judgment on the breach of warranty claim.

C.     Negligence and Negligence *Per Se*

¶ 36     Broomfield contends that the trial court erred in concluding that the negligence claims were time barred by the contract and § 13-80-102(1) and that it failed to establish that Brinkmann performed design services. Brinkmann responds that summary

23

judgment was appropriate because the evidence offered by Broomfield does not specifically link Brinkmann to the design changes. Because we conclude these claims are not time barred, and because the parties offered conflicting design services evidence, we reverse the trial court's summary judgment on them.

¶ 37 We first address the time-bar issue and note that the trial court concluded, from the descriptions in the complaint, that the twenty-seven defects alleged were "open and obvious" conditions of the project — patent defects — and that the corresponding claims accrued, under the contract, at the latest on May 15, 2009. Thus, it reasoned the two-year statute of limitations under § 13-80-102(1) ran on May 15, 2011, and barred the negligence claims.

¶ 38 Because we have concluded that the HPA applies, any negligence claims accrued in the fall of 2012 when the sewer flies were discovered. Broomfield's July 2014 complaint, therefore, was not time barred under § 13-80-102(1). Moreover, for the reasons set forth in Part IV, *infra,* we conclude that genuine issues of material fact remain concerning whether the alleged defects were patent or latent.

¶ 39     Broomfield contends that Brinkmann was negligent in making certain plumbing decisions when constructing the building and that it unilaterally modified the design of the pipes beneath the building in violation of the contract. In support, Broomfield relies on the Fronapfel affidavit, which states that revisions to the design drawings, including revisions to the plumbing, were made during construction.

¶ 40     In contrast, Brinkmann asserts that it never engaged in design activities. It relies on deposition testimony that the changes described were to the "means and methods" of construction and not to the design. Our review of this deposition excerpt reveals that the change was a request to "shortcut the design," and that Brinkmann should have "withdrawn the request to deviate." Viewing this evidence in the light most favorable to Broomfield, as we must, we conclude it creates a question of disputed fact about whether Brinkmann engaged in extra-contractual design services and, if so, whether Brinkmann was negligent. *Fin. Assocs., Ltd. v. G.E. Johnson Constr. Co.*, 723 P.2d 135, 138 (Colo. 1986) ("An issue of fact may arise from the existence of conflicting permissible inferences from evidence accepted as true."). Accordingly, we

reverse summary judgment on the negligence and negligence *per se* claims.

## IV.  Patent and Latent Defects

¶ 41    Because we conclude that the statutory accrual provisions apply, the date of a defect's discovery necessarily controls the date the statute of limitations begins to run.  *Morrison*, 91 P.3d at 1053 (stating that a limitations period begins to run upon accrual absent tolling, which will delay the start of the limitations period).  "The point of accrual is usually a question of fact, but if the undisputed facts clearly show when a plaintiff discovered or should have discovered the damage or conduct, the issue may be decided as a matter of law."  *Gognat v. Ellsworth*, 224 P.3d 1039, 1045 (Colo. App. 2009) (quoting *Murry v. GuideOne Specialty Mut. Ins. Co.*, 194 P.3d 489, 491 (Colo. App. 2008)), *aff'd*, 259 P.3d 497 (Colo. 2011). "The critical inquiry of when an action accrues is knowledge of the facts essential to the cause of action, not knowledge of the legal theory upon which the action may be brought."  *Id.* (quoting *Olson v. State Farm Mut. Auto. Ins. Co.*, 174 P.3d 849, 854 (Colo. App. 2007)).  Therefore, we must address Broomfield's contention that the record shows disputed issues of material fact as to whether the

26

defects are patent or latent.  It contends that the Fronapfel affidavit alone demonstrates facts that could support a finding that all of the defects were latent.  Brinkmann counters that because the word "external" appears in many of the defects' descriptions, the trial court properly concluded that the majority of the defects were patent.

¶ 42  In its written order, the trial court listed a portion of the defects contained in the notice of claim and concluded that the "vast majority" of the partial list of defects were readily observable.  It did not base this conclusion on any evidence in the record, but instead on its own interpretation of the descriptions.  In doing so, the trial court mistakenly disregarded the Fronapfel affidavit, which described different phases of excavation that revealed different construction defects over a lengthy period of time.  Moreover, the trial court did not state which alleged defects were latent and which were patent, leaving questions of fact unresolved.

¶ 43  Considering the evidence in the light most favorable to Broomfield, a genuine issue of fact remains concerning whether the alleged defects are patent or latent.  And, it is the province of the fact finder to make this determination.  *See Park Rise Homeowners*

27

*Ass'n v. Res. Constr. Co.,* 155 P.3d 427, 431 (Colo. App. 2006) ("Applying the test of whether such defects were discoverable through reasonable inspection by a home buyer to the eighteen defect categories used by the HOA's damages expert, several of which were broken down into subcategories, the jury could, based on its common knowledge and with a proper instruction, have determined which defects were latent."). Therefore, on remand, the trier of fact should weigh the evidence and determine which defects were patent and which were latent.

## V. Conclusion

¶ 44    The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

JUDGE ASHBY concurs.

JUDGE DAVIDSON specially concurs.

JUDGE DAVIDSON, specially concurring.

¶ 45    I agree with the result reached by the majority in Parts II.A,
II.B, III, IV, and V.  I specially concur as to Part II.C, concerning the
interpretation of the Homeowner Protection Act of 2007 (HPA),
§§ 13-20-806(7), -807, C.R.S. 2016.

¶ 46    The HPA prohibits as against public policy certain contractual
limitations on the ability to enforce rights, remedies, and damages
in construction defect lawsuits.  It was enacted "to preserve
Colorado residential property owners' legal rights and remedies,"
and it applies to "claimants asserting claims arising out of
residential property."  § 13-20-806, C.R.S. 2016.  If applicable, it
voids the limitations provisions at issue here.

¶ 47    I don't dispute the majority's plain language understanding of
"residential property," as used in the HPA, to include the Broomfield
senior facility.  I find ambiguity, however, from the use of the term
"homeowner" in the HPA's title but "residential property owner" in
its text.  Thus, unlike the majority, I find it difficult to discern solely
from plain language a clear and unambiguous legislative intent to
include commercial entities such as Broomfield in the scope of the
protections of the HPA.

¶ 48    The word "homeowner," as referred to in the short title of the

HPA, most commonly indicates people who own the home in which

they reside.  *See* The American Heritage Dictionary of the English

Language 840 (2000) (a homeowner is a person who owns the house

in which he or she lives); *see also* Webster's Third New International

Dictionary 1082 (2002) (a home is a house occupied by a family).

Because nothing in the HPA requires a different understanding,

"residential property owner," as used in the statute's text, could be

read simply as a synonym of "homeowner."  *See Frazier v. People*,

90 P.3d 807, 811 (Colo. 2004) ("Although the title of a statute is not

dispositive of legislative intent, it is a useful aid in construing a

statute.").

¶ 49    However, the term "residential property owner," standing

alone, can be read more broadly to include anyone who owns

residential property, regardless of the type of owner or how the

property is used.  *See Houston v. Wilson Mesa Ranch Homeowners

Ass'n*, 2015 COA 113, ¶ 17 (the particular use of residential

property may render the term ambiguous).  Also, although used but

undefined in the HPA, the term "claimant" is expansively described

in other portions of the Construction Defect Action Reform Act

(CDARA) as any person who brings a claim.  *See* § 13-20-802(5), C.R.S. 2016.

¶ 50     With that uncertainty, and because Broomfield, the property owner in this case, is a sophisticated commercial entity (and the developer and the property owner are related business entities), I hesitate to conclude, from the plain language alone, that the legislature intended the protective scope of the HPA to extend to Broomfield.

¶ 51     Certainly, the focus of the protections of the HPA is the individual homeowner.  *See Taylor Morrison of Colo., Inc. v. Bemas Constr., Inc.*, 2014 COA 10, ¶ 30; *see also Shaw v. Baesemann*, 773 P.2d 609, 611 (Colo. App. 1988) (legislative intent can be gleaned from the problem addressed by the legislation).

¶ 52     In contrast with commercial entities that build and sell homes, Colorado has recognized the policy need to protect the more unsophisticated, less knowledgeable individuals who buy them.  *See Cosmopolitan Homes, Inc. v. Weller*, 663 P.2d 1041, 1045 (Colo. 1983).  Similarly, Colorado courts have voided contractual liability waiver clauses as against public policy when there has been demonstrably unequal bargaining power between the parties.  *See*

31

*Boles v. Sun Ergoline, Inc.*, 223 P.3d 724, 728 (Colo. 2010) (voiding a waiver as against public policy when one party had substantially more bargaining power); *see also Huizar v. Allstate Ins. Co.*, 952 P.2d 342, 344 (Colo. 1998) (recognizing the policy need to protect individuals with disparity in bargaining power in the insurance context); *Heil Valley Ranch, Inc. v. Simkin*, 784 P.2d 781, 784 (Colo. 1989) (Exculpatory agreements are void when one party is "at such obvious disadvantage in bargaining power that the effect of the contract is to put him at the mercy of the other's negligence.") (citation omitted); *Estate of Harry v. Hawkeye-Sec. Ins. Co.*, 972 P.2d 279, 281 (Colo. App. 1998) (Parties to an insurance contract "cannot contractually abrogate statutory requirements reflecting the public policy of the state."); *cf. Chadwick v. Colt Ross Outfitters, Inc.*, 100 P.3d 465, 469 (Colo. 2004) (upholding a waiver between a commercial entity and an individual where the individual was "competent and educated").

¶ 53    Based on this authority, I understand the HPA as a codification of the policy principles underlying these cases. Specifically, as it concerns the parties to a purchase and sale of residential property, contractual waiver clauses are void as against

32

public policy because of the imbalance of knowledge, sophistication, and bargaining power between them. *See People v. Zapotocky*, 869 P.2d 1234, 1240 (Colo. 1994) (noting assumption of legislative awareness of prior decisional law on the subject under consideration).

¶ 54 Conversely, I find little authority upon which to imply legislative intent, as a matter of public policy, to extend such statutory protections to, or abrogate contractual rights between, knowledgeable and sophisticated commercial entities with equal bargaining power. Indeed, the opposite is true. *See BRW, Inc. v. Dufficy & Sons, Inc.*, 99 P.3d 66, 72 (Colo. 2004) (noting the trend in Colorado and elsewhere to protect the ability of the parties to negotiate the allocation of risk and reward that is associated with a construction project); *Rhino Fund, LLLP v. Hutchins*, 215 P.3d 1186, 1191 (Colo. App. 2008) (Colorado courts will uphold an exculpatory provision in a contract between two "business entities that have negotiated their agreement at arm's length."). "Until fully and solemnly convinced that an existent public policy is clearly revealed, a court is not warranted in applying that principle to void a contract." *Superior Oil Co. v. W. Slope Gas Co.*, 549 F. Supp. 463,

468 (D. Colo. 1982), *aff'd*, 758 F.2d 500 (10th Cir. 1985); *see also*

*Stanley v. Creighton Co.*, 911 P.2d 705, 708 (Colo. App. 1996) ("[A]

public policy that protects tenants from a waiver clause is more

compelling here, under a form residential lease, than it would be

under a commercial lease.").

¶ 55    In addition, to the extent the statutory abrogation of certain

contractual rights between sellers and purchasers of homes as

against public policy is in derogation of the common law freedom to

contract, I would think that the class of persons intended to benefit

from the HPA's protections (viz., "residential property owners")

should be construed narrowly — that is, to exclude commercial

entities such as Broomfield.  *See* § 2-4-211, C.R.S. 2016; *Van

Waters & Rogers, Inc. v. Keelan*, 840 P.2d 1070, 1076 (Colo. 1992)

("[S]tatutes in derogation of the common law must be strictly

construed, so that if the legislature wishes to abrogate rights that

would otherwise be available under the common law, it must

manifest its intent either expressly or by clear implication.").

¶ 56    In this context, I cannot conclude simply from the plain

meaning of "residential property owner" that the legislature

intended to extend the protections of the HPA to a sophisticated,

commercial entity, such as Broomfield. Thus, I find examination of the legislative history of the HPA to be appropriate and, here, instructive.

¶ 57    The hearings in both the House and Senate confirm that the overwhelming impetus for the bill was the plight of the individual homeowner — the problem was that homeowners were being forced to waive important rights in order to enter into a contract to buy a house. *See, e.g.*, Hearings on H.B. 07-1338 before the Senate Bus., Labor & Tech. Comm., 66th Gen. Assemb., 1st Sess. (Apr. 3, 2007) (statement of Sen. Viega) ("You either sign a contract as is or you don't buy a house.").

¶ 58    However, the full discussions in both the House and Senate hearings show that while the effect of the proposed legislation was subject to heated debate, so long as it involved a contract for the sale of "residential property," the type or status of the purchaser to be protected in that transaction was not.

¶ 59    Notably, the testimony, pro and con, included lengthy discussion of the impact of the proposed bill on the development and sale of numerous types of mixed-use or multi-use properties, including affordable housing projects and senior living facilities

such as at issue here. Although these types of purchasers typically are not situated like vulnerable homeowners "buying and purchasing the single largest investment in their lives," Hearings on H.B. 07-1338 before the Senate Bus., Labor & Tech. Comm., 66th Gen. Assemb., 1st Sess. (Apr. 3, 2007) (statement of Sen. Viega), the absence of any voiced concern as to the nature, status, or scope of protected homeowners was striking. To the contrary, it was assumed as a given in the discussions that a purchaser of "residential property" included not just an individual homeowner, but also the (more sophisticated and far less vulnerable) purchaser of mixed-use and multi-family properties.

¶ 60 Moreover, I note that there was no dissent to testimony that certain provisions of form American Institute of Architects residential purchase and sale contracts, such as those at issue here, would be void as against public policy under the proposed legislation. Again, there was no discussion or debate limiting the type or nature of individual or entity benefiting from this protection on the purchaser side of the transaction.

¶ 61 Importantly, then, the hearings put the legislature on notice that as it concerned a contract to purchase residential property, the

36

protections of the proposed bill extended significantly beyond the individual home buyer. Yet, the General Assembly did not adjust or change any language in response.

¶ 62      Therefore, like the majority, I conclude that the legislature intended the HPA to void the limitations waiver in the contract here, regardless of the fact that the homeowner is a sophisticated commercial entity. But, unlike the majority, I determine this legislative intent not only from the statutory language, but also from examination of its legislative history. *See Farmers Ins. Exch. v. Bill Boom, Inc.*, 961 P.2d 465, 469-70 (Colo. 1998) (stating that if statutory meaning is unclear, it is appropriate to seek the intent of the legislature by examining the legislative history as well as the social context in which the underlying bill was passed).

# APPENDIX 1

12.2.2 AFTER FINAL COMPLETION

In addition to the Contractor's obligation under Paragraph 3.5, upon receipt of written notice from the Owner, the Contractor shall promptly correct any Work that is found, within the applicable period, not to be in compliance with the requirements of the Contract Documents.  Except for latent defects, the applicable period shall be a period of one year after the date of Final Completion of the Work or for a period of one year after the date of completion of any corrective work, whichever is longer, or by terms of an applicable special warranty required by the Contract Documents.  If any latent defect or deficiency which was not active or apparent by reasonable inspection during the course of construction or before Final Completion or before the end of the warranty period is discovered, then the applicable period shall be extended by one year after the discovery of such latent defect.  The contractor shall correct all non-compliant Work promptly unless the Owner has previously given the Contractor an express written acceptance of such condition.  The Owner shall give such notice to correct non-compliant Work promptly after discovery of the non-

compliant condition.  During the applicable period for correction of the work, if the Owner fails to notify the Contractor and give the Contractor an opportunity to make the correction, the Owner waives the rights to require correction by the Contractor and to make a claim for breach of warranty.  If the contractor fails to correct nonconforming Work within a reasonable time during that period after receipt of notice from the Owner or Architect, the Owner may correct it in accordance with Paragraph 2.4.



# APPENDIX 2

13.7  COMMENCEMENT OF STATUTORY LIMITATION PERIOD

.1 Before Substantial Completion.  As to acts or failures to act occurring prior to the relevant date of substantial Completion, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than such date of Substantial Completion;

.2  Between Substantial Completion and Final Certificate for Payment.  As to acts or failures to act occurring subsequent to the relevant date of Substantial Completion and prior to the issuance of the final Certificate for Payment, any applicable statute of limitations shall commence and run and any alleged cause of action shall be deemed to have accrued in any and all events not later than the date of issuance of the final Certificate for Payment and

.3  After Final Certificate for Payment.  As to acts or failures to act occurring after the relevant date of issuance of the final Certificate for Payment, any applicable statute of limitations shall commence to run and any alleged cause of action shall be deemed to have accrued in any and all events not later than the date of any act or failure to act by the Contractor pursuant to any Warranty

provided under Paragraph 3.5, the date of any correction of the Work or failure to correct the Work by the Contractor under paragraph 12.2 or the date of actual commission of any other act or failure to perform any duty or obligation by the Contractor or Owner, whichever occurs last.


APPENDIX 3

Defects Identified by SBSA:

     (a) GEOTECHNICAL
          (i) Insufficient Design of Void Space
          (ii) Differential Movement of Foundation
     (b) FOUNDATION SYSTEM
          (i) Non-Compliant Construction of Void Space below
             Structural Slab-On-Void and Grade Beams
     (c) GRADING AND DRAINAGE
          (i) Non-Compliant Slope to Drain from Foundation
          (ii) Non-Compliant Exterior Drains
          (iii) Non-Compliant Drainage of West Courtyard
          (iv) Non-Compliant Clearance to Grade
          (v) No Perimeter Drain Provided for AL Wing
          (vi) Non-Compliant Perimeter Drain for IL Wing
          (vii) Non-Compliant Irrigation Near Building
     (d) CONCRETE FLATWORK
          (i) Differential Movement of Flatwork
          (ii) Non-Compliant Isolation
     (e) STREETS AND ROADWAYS
          (i) Differential Movement of Driveways and
             Roadways
     (f) FAÇADE (EXTERIOR CLADDING AND SEALANTS)
     TYPE 1 – LAP SIDING AND TRIM
          (i) Non-Compliant Clearance to Grade
          (ii) Non-Compliant Clearance to Hard Surfaces
          (iii) Non-Compliant Joint Provisions at Dissimilar
             Materials
     (g) FAÇADE (EXTERIOR CLADDING AND SEALANTS)
     TYPE 2 ·STONE VENEER
          (i) Non-Compliant Clearance to Grade
          (ii) Non-Compliant Clearance to Bard Surfaces
          (iii) Non-Compliant Joint Provisions at Dissimilar
             Materials
     (h) MOISTURE MANAGEMENT SYSTEM (BARRIERS,
       FLASHINGS, DRAINAGE, ETC.)
          (i)Obstructed Weep Mechanism at Horizontal
             Terminations
     (i) FENESTRATIONS (WINDOWS. DOORS, CURTAIN

WALLS, ETC.)
    (i) The windows must be integrally tied into the Weather Resistive Barrier and related moisture management materials to perform properly.

(j) ROOFING SYSTEM TYPE 1 - ASPHALT SHINGLES
    (i) Non-Compliant Diverter Flashings
    (ii) Non-Compliant Downspout Extension
    (iii) Non-Compliant Discharge of Emergency Overflow Drains

(k) ELEVATED DECKS, BALCONIES, OR WALKWAYS
    (i) Non-Compliant Waterproofing at Exterior Decks
    (ii) Non-Compliant Waterproofing of West Courtyard

(l) MECHANICAL, ELECTRICAL, PLUMBING
    (i) Clearance for Under-Slab Piping Not Provided
    (ii) Non-Compliant Penetrations at Grade-Beams
    (iii) Non-ventilated or Conditioned Spaces below the Foundation Slab
    (iv) Improper Isolation of Mechanical and Electrical Systems