The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
August 26, 2021

## 2021COA117

**No. 20CA1692, *Colorado v. Center for Excellence* — Consumers — Colorado Consumer Protection Act — Unfair or Deceptive Trade Practices — Enforcement — Significant Public Impact**

A division of the court of appeals considers whether a 2019 amendment to the Consumer Protection Act, section 6-1-103, C.R.S. 2020 — which provides that an action brought by the Attorney General "does not require proof that a deceptive trade practice has a significant public impact" — applies retroactively. The division concludes that the 2019 amendment constituted a change in the law and the change does not apply retroactively. On this basis, the division further concludes that each of the Consumer Protection Act claims in this case must be retried because the trial court erred when it decided that the Attorney General did not have to prove that defendants' conduct significantly impacted the public.

COLORADO COURT OF APPEALS       **2021COA117**

Court of Appeals No. 20CA1692
City and County of Denver District Court No. 14CV34530
Honorable Ross B.H. Buchanan, Judge

State of Colorado, ex rel.; Philip J. Weiser, as Attorney General of the State of Colorado; and Martha Fulford, as Administrator of the Uniform Consumer Credit Code,

Plaintiffs-Appellees and Cross-Appellants,

v.

Center for Excellence in Higher Education, Inc., a not-for-profit company; CollegeAmerica Denver, Inc.; CollegeAmerica Arizona, Inc., divisions thereof d/b/a College America; Stevens-Henager College, Inc., a division thereof d/b/a Stevens-Henagar College; CollegeAmerica Services, Inc., a division thereof; Carl Barney, Chairman of Center for Excellence in Higher Education, Inc., and Trustee of the Carl Barney Living Trust; The Carl Barney Living Trust; and Eric Juhlin, Chief Executive Officer of Center for Excellence in Higher Education, Inc.,

Defendants-Appellants and Cross-Appellees.

---

JUDGMENT AFFIRMED IN PART, REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division A
Opinion by CHIEF JUDGE BERNARD
Welling and Tow, JJ., concur

Announced August 26, 2021

---

Philip J. Weiser, Attorney General, Eric R. Olson, Solicitor General, Abigail M. Hinchcliff, First Assistant Attorney General, Olivia D. Webster, Senior Assistant Attorney General II, Mark T. Bailey, Senior Assistant Attorney General II, Hanah M. Harris, Assistant Attorney General, Denver, Colorado, for Plaintiffs-Appellees and Cross-Appellants

Connelly Law LLC, Sean Connelly, Denver, Colorado, for Defendants-Appellants and Cross-Appellees Center for Excellence in Higher Education, Inc., CollegeAmerica Denver, Inc., CollegeAmerica Arizona, Inc., Stevens-Henager College, Inc., and CollegeAmerica Services, Inc.

L S Pozner, PLLC, Larry S. Pozner, Denver, Colorado; Gombos Leyton PC, Steven M. Gombos, Jacob C. Shorter, Fairfax, Virginia, for Defendants-Appellants and Cross-Appellees Carl Barney, The Carl Barney Living Trust, and Eric Juhlin

¶ 1    Certain advertisements are seemingly ubiquitous, appearing on the television, on the radio, and in print.  As is pertinent to this case, one frequently aired television advertisement began, "You've been lied to.  The truth is, the right college degree can lead to a higher paying job.  And with the right degree from CollegeAmerica you could get a better job."

¶ 2    According to Colorado's Attorney General, some ten thousand Colorado consumers responded to advertisements such as the one quoted above and enrolled in CollegeAmerica.  But those consumers, the Attorney General alleged, were sold a bill of goods.  Instead of achieving the career advancement and increased income that they were led to expect, they entered degree programs that did not prepare them for jobs in their fields of study, and they were left saddled with debt that they had no hope of repaying.  The Attorney General added that CollegeAmerica knew about these deficiencies in its programs, but it did not care; it was making money.

¶ 3    To hear CollegeAmerica tell it, it was filling a critical gap in the market, offering nontraditional, often disadvantaged students the opportunity to earn marketable degrees in high-demand fields in

1

less time than local community colleges could, and with a better chance of graduating, too.

¶ 4    In December 2014, the Attorney General and the Administrator of the Uniform Consumer Credit Code sued the corporate entities and the individuals that made up CollegeAmerica's Colorado operation.  (CollegeAmerica also has a presence in other states.)  We shall refer to the plaintiffs collectively as "the Attorney General."  The named corporate defendants were the Center for Excellence in Higher Education, Inc., and its subsidiaries; the named individual defendants were Carl Barney, Eric Juhlin, and the Carl Barney Living Trust.  We shall refer to the defendants collectively as "CollegeAmerica" unless we need to identify them individually.  We note that, although the corporate defendants and the individual defendants were represented by the same counsel during the trial, they are represented by separate counsel on appeal.

¶ 5    The complaint alleged that CollegeAmerica's efforts to recruit consumers and enroll them as CollegeAmerica students violated the Colorado Consumer Protection Act, or the CCPA, which we will

shorten to "the Consumer Act," and Colorado's Uniform Consumer Credit Code, or the UCCC, which we will call "the Credit Code."

¶ 6 In particular, the Attorney General alleged that CollegeAmerica (1) "knowingly made false representations as to the state governmental approval necessary to offer various degrees and certifications," in violation of section 6-1-105(1)(b), C.R.S. 2014; (2) "knowingly misrepresented the outcomes and benefits of certain or all of [its] degree programs; the characteristics and benefits of its loans and scholarships; and the sponsorship, approval[,] or affiliation necessary to offer certain degree programs and certifications," in violation of section 6-1-105(1)(e); (3) "knew or should have known that [it had] misrepresented the outcomes, value[,] and quality of [its] various degree programs," in violation of section 6-1-105(1)(g); (4) engaged in "bait and switch" advertising, in violation of section 6-1-105(1)(n)(I), (II); (5) failed to disclose material information with the intent to induce consumers to enroll as students, in violation of section 6-1-105(1)(u); (6) "failed to obtain the necessary authorization to offer certain degree programs," in violation of section 6-1-105(1)(z); and (7) engaged in fraudulent or

3

unconscionable conduct in inducing consumers to enter into loans, in violation of section 5-6-112, C.R.S. 2020.

¶ 7 The trial court partially dismissed the "bait and switch" claim. The court held a four-week bench trial on the remaining claims beginning in October 2017.

¶ 8 The court issued its judgment, which included findings of fact and conclusions of law, about two years and nine months later. Much of the court's order was copied verbatim from the Attorney General's proposed order, and one of the reasons we know this is because the same typographical errors that appear in the trial court's order are also found in the Attorney General's proposed order.

¶ 9 The court decided that all the named defendants were jointly and severally liable for violating the Consumer Act, and it ordered them to pay $3 million in civil penalties; it issued detailed injunctions against CollegeAmerica under both the Consumer Act and the Credit Code; it denied the Attorney General's request that CollegeAmerica pay back every dollar that its Colorado consumers had ever paid on tuition and for fees; and it determined that

CollegeAmerica's loan program, known as EduPlan, was not unconscionable.

¶ 10 CollegeAmerica and the Attorney General appeal the trial court's judgment. CollegeAmerica asserts that the judgment went too far; the Attorney General counters that the judgment did not go far enough.

¶ 11 Specifically, the corporate defendants contend that the trial court erred when it (1) applied a 2019 amendment to the Consumer Act — which did away with the Attorney General's burden of proving "significant public impact" — retroactively; (2) deprived them of their right to a jury trial; (3) allowed the Attorney General to pursue what amounted to a claim for educational malpractice; (4) held the corporate defendants liable for conduct that federal regulations required, thus substituting its own policy judgments for those of the federal regulators; (5) decided the Consumer Act claims against them; and (6) deprived them of their right to a fair process because its ruling was long delayed and it incorporated so much of the Attorney General's proposed order.

¶ 12 The individual defendants, meanwhile, assert that (1) the court erred when it did not require the Attorney General to prove

5

significant public impact under the Consumer Act; (2) the court erred when it denied them the right to a jury trial; (3) the evidence presented at trial did not support the imposition of personal liability against either Mr. Barney or Mr. Juhlin; and (4) the court erroneously imposed liability against the trust under an alter ego theory.

¶ 13    The Attorney General replies that the court only committed one error: it should have found, as a matter of law, that CollegeAmerica's entire EduPlan loan program was unconscionable.

¶ 14    As we shall explain, we reverse the trial court's judgment, in part, and we remand the case for a new trial.  We conclude that each of the Consumer Act claims must be retried because the trial court erred when it decided that the Attorney General did not have to prove that CollegeAmerica's conduct significantly impacted the public.  Based on this conclusion, we only address the remaining contentions that (1) must be resolved for the purposes of the new trial on remand; or (2) would obviate the need for a retrial.

## I. The Trial Court Erred When It Decided That the Attorney General Did Not Need to Prove Significant Public Impact

### A. Background

¶ 15    Before trial, CollegeAmerica asked the court to order summary judgment on two issues related to public impact. First, it argued that its programs only impacted "a handful" of students, not the public at large. Second, it argued that its mailed advertisements containing salary information and statements about the loan program did not affect the public because its tracking data showed that "no consumers who responded to any of the [s]tarting [s]alary [m]ailers enrolled in any of the programs for which starting salary information was included; and only six consumers who responded to any of the EduPlan [m]ailers enrolled in any program."

¶ 16    The court disagreed with CollegeAmerica on both issues and the larger issue of whether there was any need to prove significant public impact at all, explaining that these requests for summary judgment presented "what appear[ed] to be a matter of first impression in Colorado, which has not been squarely decided by any appellate court." The court explained that the "matter of first impression" was whether the Attorney General was required to

"demonstrate a 'significant public impact' arising from [CollegeAmerica's] alleged deceptive trade practices in order to prove a violation of the [Consumer Act]." The court then ruled that proof of a significant public impact was "not applicable to this action . . . ."

¶ 17    This issue became more complicated in late March 2019 — after the trial, but before the court issued its judgment — when House Bill 19-1289 was introduced. As originally drafted, section 1 of this bill would have amended section 6-1-105 by adding a new subsection (4). The new subsection read: "Standing to bring an action under this article 1 does not require proof that a deceptive trade practice has a significant public impact." H.B. 19-1289, 72d Gen. Assemb., 1st Reg. Sess. (Colo. 2019)(as introduced in House, Mar. 29, 2019), https://perma.cc/8Y73-8D4E.

¶ 18    In early April 2019, a division of this court announced *State ex rel. Weiser v. Castle Law Group, LLC*, 2019 COA 49, ¶ 105. The division in *Castle* held that the Attorney General *was* required to prove public impact in cases brought under the Consumer Act.

¶ 19    Then, at the end of April, the legislature amended the bill. Instead of amending the statute to add a new subsection (4) to

8

section 6-1-105 and eliminating significant public impact as a standing requirement for anyone to bring a Consumer Act claim, a new section 1 of the bill added the following language as the last sentence of section 6-1-103, C.R.S. 2020: "An action under this article 1 brought by the attorney general or a district attorney *does not require proof* that a deceptive trade practice has a significant public impact." H.B. 19-1289, 72d Gen. Assemb., 1st Reg. Sess. (Colo. 2019)(as revised, April 30, 2019)(emphasis added), https://perma.cc/AP2J-WA6Z. The General Assembly eventually passed an amended bill containing this language, and the Governor signed the amended bill into law in late May 2019.

¶ 20 So it is no surprise that, after the Governor signed the bill, the Attorney General filed a motion in this case asking the trial court to hold, as a matter of law, that, because of the bill, "*Castle* [was] . . . no longer controlling, and the . . . [trial court should] stand by its ruling that the [Attorney General was] not required to prove significant public impact."

¶ 21 The trial court addressed this motion in its final judgment. It decided that the bill "preserved the significant public impact requirement in a private action brought under the [Consumer Act]

9

. . . but clarified that the requirement did not apply to an action brought by the Attorney General or a district attorney."

### B. History of the Public Impact Requirement

¶ 22 Before our General Assembly passed the bill in 2019, the Consumer Act did not include the phrase "significant public impact." Rather, the phrase originated in case law.

¶ 23 In *Hall v. Walter*, 969 P.2d 224, 233-35 (Colo. 1998), our supreme court, relying on *Hangman Ridge Training Stables, Inc. v. Safeco Title Insurance Co.*, 719 P.2d 531, 535 (Wash. 1986), set forth five elements that had to be proven in a "private cause of action" to prevail on a Consumer Act claim:

> (1) the defendant engaged in an unfair or deceptive trade practice;
>
> (2) the challenged practice occurred in the course of the defendant's business, vocation, or occupation;
>
> (3) it "significantly impact[s] the public as actual or potential consumers of the defendant's goods, services, or property," *Hall*, 969 P.2d at 234;
>
> (4) the plaintiff suffered injury in fact to a legally protected interest; and

10

(5) the challenged practice caused the plaintiff's injury.

¶ 24    Looking at the public impact requirement specifically, the court wrote that previous Colorado cases had "recognized" that the Consumer Act (1) was "clearly enacted to control various deceptive trade practices *in dealing with the public.*" *Id.* (quoting *People ex rel. Dunbar v. Gym of Am., Inc.,* 177 Colo. 97, 107, 493 P.2d 660, 665 (1972)); and (2) "regulates practices which 'because of their nature, may prove injurious, offensive, or dangerous to the public.'" *Id.* (quoting *People ex rel. Dunbar,* 177 Colo. at 107, 493 P.2d at 665). Because of this strong emphasis, to fall under the Consumer Act's coverage, a "challenged practice must significantly impact the public as actual or potential consumers of the defendant's goods, services, or property." *Id.*

¶ 25    Although *Hall* involved a private cause of action, the supreme court then explained how these elements applied to a case brought by the Attorney General.

¶ 26    The court began by recognizing, as we have above, that the General Assembly's purpose in enacting the Consumer Act was to "prevent[] deceptive trade practices that '*may* prove injurious, offensive, or dangerous to the public'" and that the "first three

11

elements [listed in section 6-1-112] address this purpose." *Id.* at 236 (quoting *People ex rel. Dunbar*, 177 Colo. at 111, 493 P.2d at 667). But the court added that "the fourth and fifth elements" — that the plaintiff suffered an injury in fact and that the defendant's conduct caused it — "address whether the impact" of a defendant's "actions is such that the . . . plaintiff . . . has a cause of action under the statute." *Id.* In other words, it was the fourth and fifth elements that "distinguish a private [Consumer Act case] from . . . an attorney general's action for civil penalties." *Id.* Indeed, "the latter" — an Attorney General's action — "requires no showing of either actual injury or causation." *Id.* The takeaway from *Hall* is clear: although the Attorney General does not need to prove the fourth or the fifth element, the Attorney General *must* prove the first three elements, which include a significant public impact.

¶ 27    Over twenty years later, the division announced *Castle*. (We note that our supreme court has not revisited this issue since *Hall*.) *Castle* involved an appeal of a Consumer Act judgment in which the defendants contended that the Attorney General had not met its burden to prove significant public impact. The Attorney General countered that the State "did not need to prove a significant public

12

impact in a civil enforcement action." *Castle*, ¶ 105. The division rejected the Attorney General's contention for three reasons.

¶ 28 First, the division decided that, "although the supreme court did not say so directly" in *Hall*, it implied that the Attorney General must prove the first three elements under section 6-1-112, which included proof of a significant public impact. *Id.* at ¶ 108. And, to the extent the operative language in *Hall* may have been dicta, the division found it to be persuasive. *Id.*

¶ 29 Then, the division held that requiring the Attorney General to prove public impact aligned with the Consumer Act's legislative purpose of protecting the public interest. *Id.* at ¶ 109; *see People ex rel. Dunbar*, 177 Colo. at 112, 493 P.2d at 667 (The Consumer Act's purpose is to regulate practices that "because of their nature, may prove injurious, offensive, or dangerous to the public.").

¶ 30 Last, the division observed, as did our supreme court in *Hall*, that Colorado courts "have heavily relied on Washington state law in interpreting our own consumer protection law, and that jurisdiction requires [an] attorney general to prove the first three elements in a government enforcement action," including proof of public impact. *Id.* at ¶ 110 (citation omitted); *see Crowe v. Tull*, 126

13

P.3d 196, 203 (Colo. 2006)("We have previously looked to decisions of the Supreme Court of Washington for guidance in interpreting" the Consumer Act.).

¶ 31 Even though *Castle* was announced before the trial court entered its judgment in this case, the court declined to follow it. Instead, the court applied the newly amended version of section 6-1-103 from the bill, which was enacted after *Castle* was announced and which the court described as a clarification of the law "for the purpose of making plain what the legislation had been all along."

¶ 32 But was the bill truly a clarification of what the law "had been all along," or did it, in fact, change the law? The answer to this question is critical to the outcome of this appeal because whether the General Assembly clarified the law or changed it leads to different results.

- If, on the one hand, the General Assembly clarified the law, then we would conclude that the Attorney General was not required to prove that CollegeAmerica's conduct had a significant public impact.

- If, on the other hand, the General Assembly changed the law, there are two possible results.

  o If the General Assembly intended the change to apply retroactively, we would still conclude that the Attorney General was not required to prove a significant public impact.

  o But, if the General Assembly did not intend the change to apply retroactively, then *Hall* and *Castle* would lead us to conclude that the Attorney General was still required to prove a significant public impact in this case.

¶ 33    We next proceed to answer the question of whether the General Assembly changed or clarified the law.

### C.    Change or Clarification?

#### 1.    Law

¶ 34    When the General Assembly amends a statute, we presume that it intends to change the law, not simply to clarify it. *Corsentino v. Cordova*, 4 P.3d 1082, 1091 (Colo. 2000). This presumption can be rebutted, however, by showing that the General Assembly meant only to clarify an existing ambiguity in the statute. *Acad. of Charter*

*Schs. v. Adams Cnty. Sch. Dist. No. 12*, 32 P.3d 456, 464 (Colo. 2001). If an amendment merely clarifies an ambiguity, the law remains unchanged. *Id.*

¶ 35  Colorado courts apply a three-part analysis to distinguish between a change and a clarification. *Williams v. Dep't of Pub. Safety*, 2015 COA 180, ¶¶ 92-93. First, a court considers whether the prior version of the statute was ambiguous; second, the court looks to the legislative history, including statements made by the bill's sponsors regarding its purpose; and third, the court considers the statute's plain language to determine if the General Assembly intended to clarify, not change, the statute. *Id.*

## 2. Analysis

¶ 36  We conclude, for the following reasons, that applying the three-part analysis here does not rebut the presumption that the General Assembly intended to change, rather than clarify, the Consumer Act.

¶ 37  First, the prior version of the Consumer Act was not ambiguous about requiring the Attorney General to prove significant public impact. Rather, *Hall* imposed this responsibility more than two decades before the General Assembly passed House

Bill 19-1289. *See City of Colorado Springs v. Powell,* 156 P.3d 461, 468 (Colo. 2007)("These decisions, in conjunction with the General Assembly's inaction in addressing the interpretations therein, lead us to the conclusion that there was no ambiguity . . . .").

¶ 38     Largely ignoring *Hall*, the Attorney General instead focuses on *Castle*, suggesting that this decision was what prompted the General Assembly to step in and "clarify the law." But the timing of the bill does not clearly support this contention because when the bill was first introduced — which was *before Castle* was announced — it contained language that affected the obligation of *any party* — public or private — to prove significant public impact in a Consumer Act case: "Standing to bring an action under this article 1 does not require proof that a deceptive trade practice has a significant public impact."

¶ 39     It is true that the bill was amended post-*Castle* to refer specifically to the elements of a Consumer Act claim brought by the Attorney General: "An action under this article 1 brought by the attorney general . . . does not require proof that a deceptive trade practice has a significant public impact." But this amendment does not affect the fact that, pre-*Castle*, the General Assembly was

already tinkering with the requirement of proving a significant public impact.

¶ 40 Second, the legislative history of the bill is ambiguous as to whether the General Assembly intended for the significant public impact provision to be a mere clarification of the law. The existence of this ambiguity means that there is no "clear indication" that the General Assembly intended to clarify the law, *see Dep't of Transp. v. Gypsum Ranch Co.*, 244 P.3d 127, 131 (Colo. 2010), so the presumption that the bill changed the law has not been rebutted.

¶ 41 For example, during a committee hearing, one of the bill's sponsors said that the bill "removes a case law requirement for significant public impact." Hearings on H.B. 19-1289 before the S. Judiciary Comm., 72d Gen. Assemb., 1st Reg. Sess. (Apr. 24, 2019)(statement of Mike Foote, Colorado State Senator). He explained that, in 1998, our supreme court had "address[ed] the elements that would have to be proven by either a private party in a private cause of action" or by the "[A]ttorney [G]eneral . . . about what would be a violation of" the Consumer Act. *Id.* Referring to *Hall*, the sponsor continued by saying that it "pretty much put in this requirement that [there] had to [be] a significant public impact

18

before it could be addressed under the Consumer Act." *Id.*; *see also Novak v. Craven,* 195 P.3d 1115, 1122 (Colo. App. 2008)("[T]he testimony before the House and Senate Judiciary Committees of the General Assembly reflects that the overriding purpose of the 2008 amendment was to alter the legal precedent established nearly a decade ago . . . .").

¶ 42    In addition to these statements, other legislative history suggests that the bill's purpose was to change the law, not clarify it:

- an attachment to the sponsor's legislative packet stated: "Colorado is 1 of only 7 states that require proof of public harm/impact," Hearings on H.B. 19-1289 before the H. Judiciary Comm., 72d Gen. Assemb., 1st Reg. Sess., attach. H (Apr. 9, 2019); and

- the elected Attorney General testified before one of the General Assembly's committees that

   o eliminating the requirement of proving a significant public impact would beneficially affect when the Attorney General's office could initiate a consumer protection case because instead of waiting until a fraudster has committed one hundred instances of

fraud, "[we are] able to act quicker . . . to prevent more harm from happening"; and

o the reason the Attorney General's office may not have "act[ed] earlier" in some fraud cases was "because we have a statutory bar that prohibited us from [doing so]."

Hearings on H.B. 19-1289 before the H. Judiciary Comm., 72d Gen. Assemb., 1st Reg. Sess. (Apr. 9, 2019)(statement of Phil Weiser, Colorado Attorney General).

¶ 43 At the same time, the Attorney General points to testimony by a second sponsor of the bill who said that the significant public impact requirement — which he acknowledged had been "a threshold requirement" for the past twenty-one years — is "not an element" that the General Assembly "ever really agreed to" and is "contrary to the very spirit and intent of the [Consumer Act]." Hearings on H.B. 19-1289 before the H. Judiciary Comm., 72d Gen. Assemb., 1st Reg. Sess. (Apr. 9, 2019)(statement of Mike Weissman, Colorado State Representative).

¶ 44      This statement, the Attorney General says, shows that the bill was intended to clarify the law — that is, it was never the General Assembly's intent to have the significant public impact requirement apply to Consumer Act claims initiated by the Attorney General. But, when the second sponsor made this statement, he was talking about the original version, which would have removed the significant public impact requirement for all Consumer Act claims, not just those initiated by the Attorney General.  So, given the timing of this statement and the version of the bill that the second sponsor was addressing at the time, the second sponsor's statement sheds little light on the question of whether the amended bill that eventually became law was intended as a clarification or a change.

¶ 45      Even so, "[a] legislative statement 'cannot control the interpretation of an earlier enacted statute.'" *People v. Vigil*, 251 P.3d 442, 449 (Colo. App. 2010)(quoting *O'Gilvie v. United States*, 519 U.S. 79, 90 (1996)).  Indeed, the General Assembly has amended the Consumer Act repeatedly since *Hall* was decided, but until House Bill 19-1289, it had not addressed the Attorney General's obligation to prove a significant public impact.  "When the legislature reenacts or amends a statute and does not change a

21

section previously interpreted by settled judicial construction, it is presumed that it agrees with [the] judicial construction of the statute." *Tompkins v. DeLeon*, 197 Colo. 569, 571, 595 P.2d 242, 243-44 (1979). So, as is pertinent to this part of our analysis, "where an existing statute has already undergone construction by a final judicial authority, further legislative amendment necessarily reflects the legislature's understanding of that construction, or perhaps simply disagreement with how it is being (or fear of how it is likely to be) interpreted by other courts." *Union Pac. R.R. Co. v. Martin*, 209 P.3d 185, 188-89 (Colo. 2009). Such an amendment "can fairly be presumed to intend a change in the law — the law as the amending legislature believes it to be following earlier judicial construction — but it implies virtually nothing about original legislative intent." *Id.*

¶ 46 This brings us to the third part of our analysis: we conclude that the language of the bill does not rebut the presumption that the General Assembly intended to change the law. For example, there is no statement in the bill that "it merely clarifies" the Consumer Act. *See Williams*, ¶ 94. To the contrary, the bill title states that it "concern[s] the creation of *additional* protections in the

22

Colorado consumer code." Ch. 268, 2019 Colo. Sess. Laws 2515 (emphasis added). Such language indicates an intent to change the law. *See Powell*, 156 P.3d at 466 (Bill language referring to "'modifications of, and additions to' . . . suggests a legislative recognition that the amendment creates substantive changes to the law."). And the bill made substantive changes to the Consumer Act, such as including reckless conduct to the definitions of consumer protection violations and adding penalties for defrauding the elderly. 2019 Colo. Sess. Laws at 2516-17.

¶ 47    Nonetheless, the Attorney General points to the applicability clause of the bill, which states that "[s]ections 2 and 3 of this act apply to civil actions filed on or after the effective date of this act. Section 4 of this act applies to judgments entered into on or after the effective date of this act." 2019 Colo. Sess. Laws at 2517. Because this clause "contains no effective date for Section 1" (where the significant public impact requirement was addressed), the Attorney General submits that the General Assembly must have intended to clarify "what the law has always been." But the absence of an effective date, without more, does not constitute a

"clear indication" that the General Assembly intended to clarify the law. *Union Pac. R.R. Co.*, 209 P.3d at 188.

¶ 48  Perhaps recognizing that overcoming this presumption is a steep hill to climb, the Attorney General alternatively argues that, even if the bill changed the law, "the amendment would still apply retroactively." As we shall explain next, we disagree with that contention, too.

### D.  Prospective or Retroactive?

#### 1.  Law

¶ 49  Absent legislative intent to the contrary, a statute is presumed to operate prospectively, meaning it only applies to events occurring after its effective date. § 2-4-202, C.R.S. 2020; *In re Estate of DeWitt*, 54 P.3d 849, 854 (Colo. 2002). By contrast, a statute operates retroactively if it applies to events that have already occurred or to rights and obligations that existed before its effective date. *DeWitt*, 54 P.3d at 854. The presumption of prospective application is rooted in policy considerations, such as the notion of fair play and the desire to promote stability in the law. *Powell*, 156 P.3d at 464. To overcome this presumption, a statute must reveal a

clear legislative intent to have the statute applied retroactively. *DeWitt*, 54 P.3d at 854.

¶ 50    While express language from the General Assembly stating its intent for a statute to be applied retroactively is not required for us to decide that it applies retroactively, it is "certainly the most efficient and obvious manner of communicating such a desire." *Powell*, 156 P.3d at 466.

## 2.    Analysis

¶ 51    The General Assembly's power to abrogate case law remains subject to the principle that, "unless intent to the contrary is shown, legislation shall apply only to those transactions occurring after it takes effect." *Powell*, 156 P.3d at 464. We recognize that "express retroactivity language is unnecessary" and that "an intent that a statute operate retroactively may be implied." *In re Marriage of Weekes*, 2020 COA 16, ¶ 26. But we nonetheless conclude that there is no clear indication in the statute, either express or implied, expressing an intent that section 1 apply retroactively. As a result, we further conclude that the presumption that the General Assembly intended section 1 to apply only prospectively controls our decision.

¶ 52    First, the bill does not state that the public impact language in section 1 is to be applied retroactively.  If the General Assembly had intended for section 1 of the bill to be retroactive, it could have said so.  *People v. Griffin*, 397 P.3d 1086, 1089 (Colo. App. 2011).  And it knows how to say so.  *See* § 18-1.3-401.5(1), C.R.S. 2020 (sentencing ranges "only apply to a conviction for a drug felony offense . . . committed on or after October 1, 2013"); *see also* Ch. 244, sec. 1, 2009 Colo. Sess. Laws 1099 (containing a legislative declaration stating that it was the General Assembly's intent in enacting a statute "to clarify" the meaning of certain parts of the criminal theft statute).

¶ 53    Second, as we have shown above, the General Assembly expressly made other sections of the bill retroactive in the applicability clause.  *See Taylor Morrison of Colo., Inc. v. Bemas Constr., Inc.*, 2014 COA 10, ¶ 23 ("[W]hen legislation purports to apply to actions filed 'on or after' a certain date, such language necessarily requires retroactive application of the statute because for an action to be filed on the effective date, it must have accrued prior to that date.").  By making these sections retroactive, and by excluding section 1 from that statement, we conclude that the

General Assembly expressed at least some intent that section 1 is *not* to be applied retroactively. *See Well Augmentation Subdistrict of Cen. Colo. Water Conservancy Dist. v. City of Aurora,* 221 P.3d 399, 419 (Colo. 2009)("When the General Assembly includes a provision in one section of a statute, but excludes the same provision from another section, we presume that the General Assembly did so purposefully."); *Holcomb v. Jan-Pro Cleaning Sys. of S. Colo.,* 172 P.3d 888, 894 (Colo. 2007)("We do not add words to the statute or subtract words from it."); *Riley v. People,* 104 P.3d 218, 221 (Colo. 2004)("The presence of one exception is generally construed as excluding other exceptions."); *Beeghly v. Mack,* 20 P.3d 610, 613 (Colo. 2001)("Under the rule of interpretation *expressio unius exclusio alterius,* the inclusion of certain items implies the exclusion of others."); *A.C. v. People,* 16 P.3d 240, 243 (Colo. 2001)("The court will not create an exception to a statute that the plain meaning does not suggest or demand.").

¶ 54    Based on these conclusions, we next conclude that *Hall* required the Attorney General to prove significant public impact as part of its case.  Recognizing this possibility, both parties ask us to decide whether the Attorney General's evidence met the burden of

proof in this case: the Attorney General asks us to hold that "the record establishes that [CollegeAmerica's] predatory practices had a significant impact on Coloradans"; CollegeAmerica responds that, for the claims "involving only a few students, judgment should be entered [for them] . . . as a matter of law."

¶ 55     But whether there is a significant public impact in a Consumer Act case is a question of fact. *One Creative Place, LLC v. Jet Ctr. Partners, LLC*, 259 P.3d 1287, 1289-90 (Colo. App. 2011). In this case, the trial court decided that the Attorney General did not have to prove that there had been a significant public impact, so it did not make any factual findings on this issue. As a result, we do not know whether the court would have decided the case differently if it had made such findings.

¶ 56     More importantly, based on the trial court's rulings — including a pretrial ruling that the Attorney General would not be required to prove significant public impact to prevail on its Consumer Act claims — the parties lacked the incentive to present evidence, rebut evidence, and develop a record on this issue. *Cf. Zwick v. Simpson*, 193 Colo. 36, 39, 572 P.2d 133, 134 (1977)("[I]t would be inequitable to foreclose the possibility of recovery because

the plaintiff failed to present evidence on a theory of damages which the trial court felt was inapplicable."). We therefore conclude that we must reverse the trial court's judgment on this ground and remand this case for a new trial on all the Consumer Act claims. *See Carousel Farms Metro. Dist. v. Woodcrest Homes, Inc.*, 2019 CO 51, ¶ 18 (observing that trial courts find facts while appellate courts pronounce the law).

## II. CollegeAmerica Did Not (and Does Not) Have a Right to a Jury Trial

¶ 57    CollegeAmerica next contends that it was entitled to a jury trial. We disagree.

### A. Preservation and Standard of Review

¶ 58    CollegeAmerica asked for a jury trial. The Attorney General moved to strike the jury demand. The trial court granted the motion to strike, reasoning that, under *People v. Shifrin*, 2014 COA 14, the basic thrust of the action was equitable, not legal, in nature. We review the issue de novo. *Shifrin*, ¶ 14.

### B. Law

¶ 59    There is no constitutional right to a jury trial in a civil case in Colorado. *Setchell v. Dellacroce*, 169 Colo. 212, 215, 454 P.2d 804,

29

806 (1969). Rather, the right is derived from C.R.C.P. 38. *Id.*
Under Rule 38, it is the character of the action that determines whether an issue of fact will be tried to a court or to a jury. *Kaitz v. Dist. Ct.*, 650 P.2d 553, 554 (Colo. 1982). Legal actions go to a jury. *Am. Fam. Mut. Ins. Co. v. DeWitt*, 218 P.3d 318, 322 (Colo. 2009). Equitable actions do not. *Id.*

¶ 60     To determine whether an action is legal or equitable in nature, courts engage in a claim-by-claim review of a plaintiff's complaint. *Mason v. Farm Credit of S. Colo., ACA*, 2018 CO 46, ¶ 11. If the complaint contains only legal claims, then the case will be tried to a jury (assuming, that is, that a jury was timely demanded and that the requisite fee was paid). *Id.* If the complaint contains only equitable claims, then the case will be tried to the court. *Id.* If the complaint contains both legal and equitable claims, then the court "must look to the overall character of the action to determine whether it is fundamentally legal or equitable." *Id.*

¶ 61     There are two ways to assess whether a claim is legal or equitable. *Peterson v. McMahon*, 99 P.3d 594, 597 (Colo. 2004). The first method is to examine the nature of the remedy sought. *Id.* Generally, legal claims seek monetary damages, while equitable

claims seek to invoke the coercive powers of the court. *Id.* The second method is to examine the historical nature of the right the plaintiff wants to enforce. *Id.* For example, a claim is equitable when the plaintiff "is seeking to enforce a right originally created in or decided by equity courts." *Id.* at 597-98. The remedial method is preferred to the historical. *Mason*, ¶ 27.

## C. Analysis

¶ 62 In this case, the Attorney General pled six claims seeking relief under the Consumer Act and one claim seeking relief under the Credit Code. As relief, the Attorney General sought (1) a declaration that CollegeAmerica's conduct violated the Consumer Act and the Credit Code; (2) an order permanently enjoining CollegeAmerica "from engaging in any deceptive trade practices and unconscionable transactions"; (3) "appropriate orders" to prevent future misconduct; (4) a judgment "for restitution, disgorgement, or other equitable relief"; (5) an order requiring CollegeAmerica to pay civil penalties; and (6) an order requiring CollegeAmerica to pay the fees and costs that the Attorney General had incurred in pursuing the case.

¶ 63    CollegeAmerica asserts that it was entitled to a jury trial because the monetary relief requested by the Attorney General "overwhelmed" the equitable relief requested, thereby revealing the fundamentally legal character of the action. To support this contention, it points to the trial court's decision to deny preliminary injunctive relief and the Attorney General's eventual request for $3 million in civil penalties and more than $200 million in restitution and disgorgement (amounts that were unknown when the complaint was filed).

¶ 64    But, "whether an action is legal or equitable is dictated *only* by the claims in a plaintiff's complaint." *Mason,* ¶ 11 (emphasis added). Accordingly, information that came to light after the Attorney General filed the complaint is irrelevant to our analysis.

¶ 65    What is more, the fact that a plaintiff is seeking money — even large sums of money — does not alone transform an equitable action into a legal one. *See Cont'l Title Co. v. Dist. Ct.,* 645 P.2d 1310, 1318 (Colo. 1982)("[N]ot all forms of monetary relief need necessarily be characterized as legal relief for purposes of the jury trial requirement."); *see also Snow Basin, Ltd. v. Boettcher & Co.,* 805 P.2d 1151, 1154 (Colo. App. 1990)(even where a plaintiff seeks

32

to recover money damages, a jury trial is not required if "the essence" of the action is equitable).

¶ 66    Beginning with the Consumer Act claims, we conclude that *Shifrin* is persuasive. In that case, as in this one, the Attorney General brought an action under the Consumer Act seeking injunctive relief, civil penalties, restitution, and disgorgement. *Shifrin*, ¶ 12. Noting that a majority of states, including Washington, treat similar consumer protection actions as equitable in nature, the division concluded that the defendant was not entitled to a jury trial. *Id.* at ¶¶ 18-22. The division explained that the Consumer Act serves primarily to deter and to punish deceptive trade practices, not to compensate injured parties. *Id.* at ¶ 21 (first citing *Hall*, 969 P.2d at 231; and then citing *May Dep't Stores Co. v. State ex rel. Woodard*, 863 P.2d 967, 972 (Colo. 1993)). So, although the Consumer Act provides for civil penalties, restitution, and disgorgement, those monetary consequences are ancillary to the Act's equitable thrust. *Id.* at ¶¶ 20-21. We agree with *Shifrin*, so we therefore conclude that the Consumer Act claims in this case are equitable.

¶ 67    Turning to the Credit Code claim, we observe that the Credit

Code does not provide for a jury trial as a matter of right.  *See*

§ 5-6-115, C.R.S. 2020 (a defendant may *request* a jury trial).  But,

even assuming that the Credit Code claim in this case is legal, not

equitable, in nature, we nonetheless conclude that the overall

character of the action is equitable because the Consumer Act

claims are more numerous and more substantive than the Credit

Code claim.  *See Mason*, ¶ 32.

¶ 68    Last, we note that the individual defendants assert that they

were entitled to a jury trial because an individual defendant's

personal liability for corporate wrongdoing is a question of fact that

must be resolved by a jury.  We do not read the case that they cite

for that proposition, *Hoang v. Arbess*, 80 P.3d 863 (Colo. App.

2003), so broadly.

¶ 69    The issue in *Hoang* was whether the trial court erred when it

usurped the power of the jury — the case's fact finder — by entering

a directed verdict when the evidence did not support such a verdict.

*Id.* at 868.  In concluding that the trial court had erred, the division

focused on the sufficiency of the evidence that had been presented

at trial, explaining that "there was sufficient evidence presented

34

that defendant knew or should have known [about certain conduct]. Hence, the issue of defendant's negligence should not have been taken from the jury by directed verdict." *Id.* at 869.

¶ 70 But *Hoang* does not say that *only* a jury could have weighed the evidence and determined whether the defendant was liable. For example, if the fact finder in *Hoang* had been the court instead of the jury, the defendant's personal liability would have remained a question of fact. The only difference would have been that, rather than moving for a directed verdict under C.R.C.P. 50 at the close of the plaintiffs' case, the defendant would have moved to dismiss under C.R.C.P. 41(b)(1). *Gold Hill Dev. Co., L.P. v. TSG Ski & Golf, LLC*, 2015 COA 177, ¶ 44.

¶ 71 We conclude that CollegeAmerica was not entitled to a jury trial when this case was originally tried and that it will not be entitled to one on remand.

### III. The Consumer Act Claims Are Not Barred by the Educational Malpractice Doctrine

¶ 72 The corporate defendants contend that the Attorney General's first three claims constitute "improper qualitative attacks" on the education that CollegeAmerica provided. We address this issue

35

only to the extent that it was raised in a pretrial motion to dismiss. To the extent that this contention is based on evidence submitted at trial, we will not address it because we are reversing the judgment and remanding the case for a new trial.

¶ 73 As we shall explain, we disagree that the Consumer Act claims are barred by the educational malpractice doctrine.

## A. Preservation

¶ 74 The corporate defendants asked the trial court to dismiss the Attorney General's first three claims, arguing that they were "improperly premised upon challenging the value of a CollegeAmerica education, in violation of the bar on claims for educational malpractice and the mandatory deference to decisions made by educational accrediting organizations." The court denied the motion, deciding that these claims were not premised on "the quality of [CollegeAmerica's] educational programs."

## B. Standard of Review

¶ 75 We review the trial court's ruling on a motion to dismiss under C.R.C.P. 12(b)(5) de novo. *Ragan v. Ragan*, 2021 COA 75, ¶ 14. In resolving a motion to dismiss, we accept all factual allegations in the complaint and attachments as true, viewing them in the light

36

most favorable to the plaintiff. *Froid v. Zacheis*, 2021 COA 74, ¶ 18. To state a claim upon which relief can be granted, "a party must plead sufficient facts that, if taken as true, suggest plausible grounds to support" the claim. *Patterson v. James*, 2018 COA 173, ¶ 23 (citing *Warne v. Hall*, 2016 CO 50, ¶ 24).

## C. Analysis

¶ 76 The corporate defendants assert that the Consumer Act "does not allow courts to value college education." Yet, according to the corporate defendants, the allegations in the complaint — such as the claim that CollegeAmerica "misrepresented the outcomes, value and quality of their various degree programs" — ask the court to do just that.

¶ 77 The corporate defendants rely on *CenCor, Inc. v. Tolman*, 868 P.2d 396, 398 (Colo. 1994), in which our supreme court held that challenges to "the general quality of educational experiences provided to students have generally been rejected." *See also Tolman v. CenCor Career Colls., Inc., Div. of CenCor, Inc.*, 851 P.2d 203, 205 (Colo. App. 1992)("Since education is a collaborative and subjective process whose success is largely reliant on the student, and since the existence of such outside factors as a student's attitude and

37

abilities render it impossible to establish any quality or curriculum deficiencies as a proximate cause to any injuries, we rule that there is no workable standard of care here and defendant would face an undue burden if forced to litigate its selection of curriculum and teaching methods."), *aff'd*, 868 P.2d 396.

¶ 78 But, in this case, the Attorney General's claims do not pertain to the quality of the education provided by CollegeAmerica. For example, none of the allegations relate to the quality of the instructors or curriculum at CollegeAmerica. Instead, the allegations are based on specific representations made by CollegeAmerica in its advertisements and during the admissions process — such as telling students that they could pursue a degree in sonography, get certified as an emergency medical technician, or qualify to sit for the limited scope radiology examination. *See Tolman*, 868 P.2d at 399 (holding claims based on an institution's failure to provide "specifically promised educational services" are allowed). Such claims do not fall within the realm of educational malpractice. *See Ross v. Creighton Univ.*, 957 F.2d 410, 416 (7th Cir. 1992)(rejecting claims of educational malpractice that ask the court "to evaluate the course of instruction . . . [and] review the

soundness of the method of teaching that has been adopted by an educational institution" (quoting *Paladino v. Adelphi Univ.*, 454 N.Y.S.2d 868, 872 (App. Div. 1982))).

¶ 79 Further, we agree with the trial court that CollegeAmerica was not excluded from the purview of the Consumer Act simply because it is an educational institution that is subject to other regulation and oversight. "Our cases have consistently applied the [Consumer Act] to advertising and marketing practices that fit within its tenets based on the applicability of the Act to the actions alleged and without regard to the occupational status of the defendant." *Crowe*, 126 P.3d at 202.

¶ 80 This reasoning lines up with the rationale of cases in other jurisdictions that allow consumer protection act claims based on educational services. *See, e.g.*, *Alsides v. Brown Inst., Ltd.*, 592 N.W.2d 468, 474 (Minn. Ct. App. 1999)("[N]othing in the statute or caselaw precludes application of the act to educational services provided by a private, proprietary, for-profit educational institution."); *Scott v. Ass'n for Childbirth at Home, Int'l*, 430 N.E.2d 1012, 1015 (1981)("[P]urchasers of educational services may be as

much in need of protection against unfair or deceptive practices in their advertising and sale as are purchasers of any other service.").

¶ 81 Accordingly, we conclude that the record and the law support the trial court's decision to deny the corporate defendants' motion to dismiss.

## IV. CollegeAmerica's Use of National Wage Data in Its Advertisements Does Not Shield It from Liability

¶ 82 The corporate defendants next contend that "colleges cannot be liable for advertising truthful federal wage data that [the Department of Education] requires them to disclose." To the extent that this contention is based on evidence presented during the trial, we do not address it because we have reversed the judgment, and we are remanding the case for a new trial. But, to the extent the corporate defendants assert that, as a matter of law, CollegeAmerica cannot be held liable under the Consumer Act for using national wage data in its advertisements, we disagree.

### A. Background

¶ 83 As is pertinent to this issue, the crux of the Attorney General's case concerning CollegeAmerica's advertisements was that it routinely used national wage data to imply that, by attending

CollegeAmerica, consumers could expect to earn incomes similar to those being advertised, when, in reality, CollegeAmerica graduates made significantly less money. But, according to the corporate defendants, a federal regulation, 34 C.F.R. § 668.6 (2019), required CollegeAmerica to disclose the national wage data to prospective students, so they cannot be held liable under the Consumer Act's section 6-1-106(1)(a), C.R.S. 2020, which we describe next.

### B. Law

¶ 84 Section 6-1-106(1)(a) provides that the Consumer Act does not apply to "[c]onduct in compliance with the orders or rules of, or a statute administered by, a federal, state, or local governmental agency." Our supreme court has twice explained what this means.

¶ 85 First, in *Showpiece Homes Corp. v. Assurance Co. of America*, 38 P.3d 47 (Colo. 2001), the court reasoned that section 6-1-106(1)(a) "exempts only those actions that are 'in compliance' with other laws," and "[c]onduct amounting to deceptive or unfair trade practices . . . would not appear to be 'in compliance' with other laws." *Id.* at 56. Moreover, the court emphasized that the section exists to avoid conflicts between laws, and, therefore, only those activities *specifically authorized* by a regulation or another

41

statute are exempt. *Id.* Noting that "almost every business is subject to some type of regulation," the court made clear that "the mere existence of a regulatory body to oversee certain standards of an industry does not remove all acts and practices of that industry from the provisions of the [Consumer Act]." *Id.* at 56-57.

¶ 86 Then, in *Crowe*, a case concerning deceptive advertising, the court reaffirmed that section 6-1-106(1)(a) "does not . . . grant a wholesale exemption to any industry or occupation that is subject to regulation." *Crowe*, 126 P.3d at 207.

## C. Analysis

¶ 87 The corporate defendants submit that CollegeAmerica's use of national wage data in its advertisements complied with 34 C.F.R. § 668.6 (2019) and, as a result, is not conduct to which the Consumer Act applies. The regulation, which is no longer in effect, required schools to disclose certain information to prospective students: (1) the occupations that the program prepared students to enter, along with links to an online database, O*NET, containing detailed information — including national wage data — about those occupations; (2) the on-time graduation rate for students; (3) the cost of tuition, fees, books, and supplies; (4) the job placement rate

for students completing the program; and (5) the median loan debt incurred by students.

¶ 88    But nothing in the regulation required CollegeAmerica to use national wage data in its advertisements.  At most, the regulation required them to disclose a link to O*NET.  And, in any event, 34 C.F.R. § 668.6 (2019) did not authorize it to use national wage data in a false or misleading manner, as the Attorney General alleged.  In fact, as the Attorney General points out, another federal regulation, 34 C.F.R. § 668.74(e) (2020), explicitly reads that a school may not make false, erroneous, or misleading statements concerning government job market statistics in relation to the potential placement of its graduates.

¶ 89    We therefore conclude that, as a matter of law, CollegeAmerica's purported compliance with 34 C.F.R. § 668.6 (2019) does not shield it from liability under the Consumer Act.

## V.    The Attorney General Did Not Prove That All EduPlan Loans Were Unconscionable

¶ 90    We now turn to the cross-appeal.  The Attorney General contends that the trial court erred when it concluded that CollegeAmerica's EduPlan loan program as a whole was not

unconscionable because the court misread section 5-6-112(3)(a). Although we agree that the court construed this section too narrowly, we nonetheless conclude that the court's factual findings were supported by the record and that, based on those findings, the Attorney General did not prove that all EduPlan loans were either substantively or procedurally unconscionable. Accordingly, we affirm the court's judgment in this regard.

## A. Standard of Review

¶ 91 "When a court enters a judgment following a bench trial, that judgment presents a mixed question of law and fact." *State Farm Mut. Auto. Ins. Co. v. Johnson*, 2017 CO 68, ¶ 12. We review legal conclusions de novo. *Id.* We review factual findings for clear error, and we will not disturb those findings unless they are clearly erroneous and not supported by the record. *Winston v. Polis*, 2021 COA 90, ¶ 10.

¶ 92 This issue also involves statutory interpretation.

¶ 93 When construing a statute, our primary purpose is to ascertain and give effect to the General Assembly's intent. *Broomfield Senior Living Owner, LLC v. R.G. Brinkmann Co.*, 2017 COA 31, ¶ 17. To do so, we start with the language of the statute,

giving its words and phrases their plain and ordinary meanings. *Id.* We read those words and phrases in context and construe them according to the rules of grammar and common usage. *Id.* In so doing, we look at the scheme as a whole, giving consistent, harmonious, and sensible effect to all of its parts. *Id.* We interpret statutes to effectuate the purpose of the legislative scheme. *Tallman Gulch Metro. Dist. v. Natureview Dev., LLC*, 2017 COA 69, ¶ 12. We must avoid constructions that would render any words or phrases superfluous or lead to illogical or absurd results. *Elder v. Williams*, 2020 CO 88, ¶ 18.

¶ 94    If the statutory language is clear and unambiguous, we apply it as written and look no further. *Vallagio at Inverness Residential Condo. Ass'n v. Metro. Homes, Inc.*, 2017 CO 69, ¶ 16. If, however, the statute is ambiguous, then we may consider other tools of statutory construction, including the statute's legislative history, the ends to be achieved by the statute, and the consequences of a given construction. *Bernache v. Brown*, 2020 COA 106, ¶ 24. A statute is ambiguous if it is susceptible of multiple reasonable interpretations. *Nieto v. Clark's Mkt., Inc.*, 2021 CO 48, ¶ 13.

## B.    The Credit Code

¶ 95    The Credit Code regulates consumer credit transactions, including consumer loans, leases, and credit sales. *Oasis Legal Fin. Grp., LLC v. Coffman*, 2015 CO 63, ¶ 34. Among other things, it empowers the administrator of the Code to bring a civil action to restrain a creditor from making or enforcing unconscionable terms or provisions in consumer loans, § 5-6-112(1)(a), or from engaging in a course of fraudulent or unconscionable conduct in inducing consumers to enter into such loans, § 5-6-112(1)(b). Subsection (1)(a) describes substantive unconscionability. Subsection (1)(b) describes procedural unconscionability.

¶ 96    To grant relief under section 5-6-112, a court must make three findings: (1) that the creditor has made unconscionable agreements or has engaged or is likely to engage in a course of fraudulent or unconscionable conduct; (2) that the conduct or agreements have caused or are likely to cause consumer injury; and (3) that the creditor has been able to cause injury primarily because the transactions involved are credit transactions. § 5-6-112(2)(a)-(c).

¶ 97    In applying section 5-6-112, a court is required to consider each of the six factors spelled out in subsection (3), which we will

discuss in more detail below, and it may consider other factors at its discretion. *See* § 5-6-112(3) ("consideration *shall* be given to each of the following factors, among others")(emphasis added); *see also Nieto*, ¶ 32 ("[W]e have 'consistently held that the use of the word "shall" in a statute is usually deemed to involve a mandatory connotation.'" (quoting *People v. Dist. Ct.*, 713 P.2d 918, 921 (Colo. 1986))).

## C.     Analysis

¶ 98     The trial court made detailed factual findings concerning the subsection (3) factors. It then concluded that, with respect to fourteen identified borrowers — students who were incapable of performing college-level work because of either severe learning disabilities or "dire" economic circumstances; students who took out loans to pursue a degree in sonography, to seek EMT certification, or to sit for the limited scope radiology examination; and students for whom a loan was created and their signature "waived" — CollegeAmerica had engaged in fraudulent or unconscionable conduct in inducing them to enter into their EduPlan loans. At the same time, the court found that the EduPlan

47

loan program, as a whole, was not unconscionable. The Attorney General takes issue with the latter conclusion.

¶ 99    Specifically, the Attorney General contends that the court misapplied factor (3)(a), which we shall call the "probability of repayment" factor, that instructs courts to consider "[w]hether the creditor should have reasonably believed at the time [the loan was] made that, according to the credit terms or schedule of payments, there was no reasonable probability of payment in full of the obligation by the consumer." § 5-6-112(3)(a).

¶ 100   According to the court, application of this factor begins and ends with the terms of a loan — and, therefore, does not require consideration of a borrower's personal circumstances — because the phrase "according to the credit terms or schedule of payments" tells courts that the loan's terms should be the focus of their analysis.

¶ 101   Said differently, the court explained that the factor worked against the Attorney General because, even though the court found that CollegeAmerica annually wrote off upwards of forty percent of outstanding EduPlan loan debt as uncollectible, the Attorney General did not "tie[] CollegeAmerica students' poor performance on

paying off their EduPlan loans directly and specifically to the credit terms and payment schedules of the loans themselves, as required by the statute."

¶ 102    The Attorney General contends that the court's reading is too narrow and contravenes the legislative intent of the Credit Code. Although we conclude that the probability of repayment factor is ambiguous, we nonetheless agree with the Attorney General that the trial court read that factor inconsistently with the General Assembly's intent.

¶ 103    Looking first at the language of section 5-6-112(3)(a), we conclude that the probability of repayment factor is susceptible of multiple reasonable interpretations.  On the one hand, the factor explicitly directs a court to look at the terms of a loan when determining whether the creditor should have reasonably believed that full repayment of the loan was likely.  On the other hand, the factor indicates that this determination must be made with reference to "the consumer."  In other words, a court must decide whether a reasonable lender would have thought it reasonably probable that *this borrower* would fully repay a loan with *these terms.*  Further complicating matters, the text of the factor does not

49

explain who "the consumer" is or which factors concerning a consumer's circumstances warrant consideration.

¶ 104   Our task is to resolve the tension between these competing interpretations.  To do so, we first consider the Credit Code's legislative history.  *See Bernache*, ¶ 24.  As is relevant to the question before us, the Credit Code was repealed and reenacted in 2000, at which time the probability of repayment factor was amended.  Before 2000, this factor instructed courts to consider "[b]elief by the creditor at the time [the loan was] made that there was no reasonable probability of payment in full of the obligation by the debtor."  § 5-6-111(3)(a), C.R.S. 1999.

¶ 105   There are two relevant differences between the old version of the factor and the current one: (1) the factor is now objective instead of subjective; and (2) the clause "according to the credit terms or schedule of payments" was added.  We are concerned with the second change.

¶ 106   Before the amendment, a court was free to consider whatever facts it found relevant when deciding whether a lender believed full repayment by a borrower was reasonably probable.  After the amendment, a court is obligated to consider the terms of the loan.

The question is whether a court's inquiry is now limited to only the terms. We think the answer is "no," and our conclusion finds support in a report that was authored by the Credit Code Revision Committee in anticipation of the 2000 amendments.

¶ 107   According to the report, the probability of repayment factor "should be amended to require that the creditor's belief be objectively reasonable and that the ability to repay *also* be based on the repayment terms of the obligation." Laura E. Udis, Adm'r of the Unif. Consumer Credit Code, *Report of the Uniform Consumer Credit Code Revision Committee and Actions of the Colorado Commission on Consumer Credit* (Nov. 30, 1999)(emphasis added.) This strongly suggests that, while the terms of a loan are one thing a court should consider when applying the factor, they are not the only thing. *See Roberts v. People*, 130 P.3d 1005, 1009 (Colo. 2006)("The word 'also' implies . . . *in addition* to . . . .").

¶ 108   Turning next to the Credit Code's statutory goals, *see Bernache*, ¶ 24, the General Assembly declared that the Credit Code "shall be liberally construed and applied to promote its underlying purposes and policies." § 5-1-102(1), C.R.S. 2020. One of those purposes is to protect consumer borrowers against unfair practices

by suppliers of consumer credit. § 5-1-102(2)(d). Interpreting the probability of repayment factor as allowing a court to consider more than just the loan terms furthers this purpose.

¶ 109 In addition, our interpretation avoids illogical results. For example, if a court is only allowed to consider the credit terms or payment schedule, a creditor would be allowed to make a credit sale, a loan, or a lease to a consumer whom the creditor knows would be unable to fully repay, so long as the terms of the transaction are facially fair. This is precisely the kind of unscrupulous behavior that the Credit Code is intended to prevent.

¶ 110 So, based on the Credit Code's legislative history and purpose, we conclude that the probability of repayment factor requires courts to look beyond the terms of a loan to the circumstances of the consumer.

¶ 111 The Attorney General makes an additional point. Based on the evidence that was presented at trial, the Attorney General thinks that the phrase "the consumer" means borrowers in the aggregate. That is, the Attorney General wants to rely on statistics about the EduPlan loan program as a whole (e.g., a high default rate) to demonstrate that a reasonable creditor would not have

thought that there was a reasonable probability that *any* EduPlan loan would be repaid in full. But, instead of borrowers in the aggregate, section 5-6-112 directs a court to look at "the" — not "a" — borrower. *See People v. Flynn*, 2020 COA 54, ¶ 17 ("It is a rule of law well established that the definite article 'the' particularizes the subject which it precedes. It is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.'"); *see also People v. Wentling*, 2015 COA 172, ¶ 15 ("'A' is an indefinite article indicating that the noun it refers to is not particular, and it is 'used as a function word before most singular nouns . . . when the individual in question is undetermined, unidentified, or unspecified.'" (quoting Webster's Third New International Dictionary 1 (2002))).

¶ 112     We further conclude that this means that the Attorney General could not, as the trial court pointed out, rely solely on evidence that is "statistical and macroeconomic in nature" when attempting to prove that a given loan is substantively unconscionable. Rather, the probability of repayment factor requires evidence about specific consumers.

¶ 113     Reading subsection (3) as a whole also supports our conclusion because other factors in subsection (3) direct the court

to consider specific consumers. *See In re Marriage of Herold*, 2021 COA 16, ¶ 8 ("When interpreting a statute, we read and consider the statute as a whole . . . ."). For example, subsection (3)(b) directs courts to consider "[w]hether the creditor reasonably should have known, at the time of the transaction, of the inability of *the consumer* to receive substantial benefits from the transaction." § 5-6-112(3)(b) (emphasis added). Whether a borrower will be able to substantially benefit from a loan would seem to depend primarily on that borrower's individual circumstances.

¶ 114 Similarly, subsection (3)(e) directs courts to consider whether a creditor "has knowingly taken advantage of the inability of *the consumer* reasonably to protect his or her interests by reason of physical or mental infirmities, ignorance, illiteracy, or inability to understand the language of the agreement, or similar factors." § 5-6-112(3)(e) (emphasis added). These reasons relate to specific consumers — not aggregate data.

¶ 115 Our conclusion is also consistent with how the Attorney General and the court both treated the factor with respect to the allegations of procedural unconscionability. For each of the fourteen borrowers for whom the court granted relief under

subsection (1)(b), the Attorney General introduced evidence specific to those borrowers that, in turn, allowed the court to find that they had been treated unconscionably by CollegeAmerica.

¶ 116 Last, we do not address the Attorney General's contention that a court may find a loan unconscionable based on the probability of repayment factor alone because, even if we accept that contention, the court ultimately did what the Attorney General asked it to do, which was to consider the terms of EduPlan loans in conjunction with the Attorney General's statistical and macroeconomic evidence. Still the court found that this factor "militates against a finding of unconscionability in the EduPlan program."

VI. The Case Must Be Reassigned to a Different Judge on Remand

¶ 117 Finally, the corporate defendants request that we order that all further proceedings on remand be held before a different judge on remand. We grant that request.

A. Background

¶ 118 With nearly fifty witnesses testifying over four weeks, the trial presented a massive undertaking for everyone involved, including the court. It was therefore not surprising that, at the trial's end, the court took the case under advisement and cautioned the parties

that "[w]e will have a written order as soon as possible . . . but it's going to take a while to work through all of it."

¶ 119 But the court took about two years and nine months to issue its judgment. In a post-trial motion, CollegeAmerica asked the court to grant them a new trial and transfer the case to a different judge because "avoiding an appearance of impropriety and preserving the reality and appearance of justice demand a fresh start." The court denied the motion.

## B. Analysis

¶ 120 The corporate defendants' request to reassign this case to a different judge on remand is "extraordinary" and "should be granted only when 'there is proof of personal bias or under extreme circumstances.'" *Guy v. Whitsitt*, 2020 COA 93, ¶ 37 (quoting *United States v. Aragon*, 922 F.3d 1102, 1113 (10th Cir. 2019)). We do not think that the judge who presided over the trial harbors any personal bias that renders him unfit to preside. But we conclude that the significant delay in issuing the court's order is an extreme circumstance that requires a new judge to take over the case on remand to "preserve the appearance of justice." *Aragon*, 922 F.3d at 1113 (quoting *Mitchell v. Maynard*, 80 F.3d 1433, 1450 (10th Cir.

1996)); *see also In re Jones*, 728 P.2d 311, 314 (Colo. 1986)(A judge's "inexcusable delay" of two years and three months in issuing a decision after a bench trial "was detrimental to the interests of the litigants" and "tended to cast disrepute upon the entire judicial system.").

¶ 121　The judgment is affirmed in part and reversed in part, and the case is remanded for proceedings consistent with this opinion.

JUDGE WELLING and JUDGE TOW concur.